State *v.* Huting.

The State, Respondent, *vs.* Huting, Appellant.

1. Where a motion to discharge a prisoner, under the 25th section of the 6th article of the act concerning practice and proceedings in criminal cases, (R. C. 1845,) for a failure to bring him to trial before the end of the second term after indictment found, is overruled by the inferior court, the facts upon which the motion is based must be proved and the evidence saved by bill of exceptions, so that the supreme court can see affirmatively that the delay was not for one of the causes which would prevent it from operating as a discharge, or it will be presumed that the motion was properly overruled.

2. In considering whether a prisoner is entitled to a discharge under the section of the statute above referred to, a term which lapses or which is adjourned in the midst of the trial, by reason of the illness of the judge, is not to be counted ; nor is a term at which there was a trial and a failure of the jury to agree to be counted, the constitution authorizing a continuance in such a case ; nor is a term, which is by law limited to six days, to be counted, where, on the fourth day, the case was continued, because up to that time only five jurors had been empannelled ; nor are special terms to be counted. The statute was intended to operate only when there is some laches on the part of the state.

3. Partial insanity is no excuse for a crime, if the defendant was capable of distinguishing between right and wrong, in regard to the act charged to be criminal.

4. A party charged with murder, who admits the killing, and relies upon the defence of insanity, must make it out to the satisfaction of the jury, and is not entitled to the benefit of a reasonable doubt as to his sanity.

*Appeal from Montgomery Circuit Court.*

The facts are sufficiently stated in the opinion of the court.

*Jamison* and *Jones,* for appellant, in their brief, insisted that the Circuit Court should have instructed the jury to acquit if they had a reasonable doubt as to the sanity of the defendant.

*Gardenhire,* (attorney general,) for the State, in his brief,

argued the single point that the Circuit Court did not err in overruling the motion to discharge the defendant on account of the delay in bringing him to trial ; and that the onus was on the defendant of showing that the delay was not for one of the causes preventing a discharge.

RYLAND, Judge, delivered the opinion of the court.

At the September term of the Circuit Court, within and for the county of Montgomery, in the year A. D. 1851, John Huting, the defendant, was indicted for the murder of Caroline Scholton. The prisoner was brought into court from the custody of the jailor. The court assigned counsel to assist the prisoner in his defence, and also appointed an interpreter, who was duly sworn as such in the cause. The prisoner was then arraigned, and plead not guilty, and the trial was continued until April term following.

The illness of the judge prevented the meeting of the court at the regular term in April, 1852, and consequently there was no April term of the court.

The trial of this case commenced at the September term, in the year eighteen hundred and fifty-two, and the record shows that it was not completed, owing to the illness of the judge of the court ; that the court discharged the jurors, and remanded the prisoner, and continued the case.

The case was again called at the April term, in the year eighteen hundred and fifty-three, and a jury was empannelled and the case was submitted to the jury, but they were unable to agree in their verdict, and were by the court discharged. The prisoner was again remanded, and the case continued.

At the September term, A. D. 1853, the case was called up for trial, and a part of the jury was sworn, and on the fourth day of the term, the court being unable to complete and make up the jury, the jurors who had been sworn were discharged, the prisoner remanded to jail, and the case continued.

At the April term, A. D. 1854, the case was again called up

for trial; the prisoner, by his counsel, moved the court to discharge him, under the 25th section of the 6th article of the act concerning criminal proceedings, because the prisoner had not been brought to trial in accordance with the provisions of said section. This motion was overruled, the defendant excepted, and filed his bill of exceptions.

The prisoner was then tried and found guilty of murder in the first degree; judgment was rendered on the verdict. The prisoner moved for a new trial; also, in arrest of judgment. These motions being overruled, he brings the case here by appeal; the execution of the judgment being, by order of the Circuit Court, suspended, until the hearing and decision of the case upon the appeal in this court.

The following are the material facts given in evidence, as appears by the record: Adelhied Scholton, a witness for the State, sworn, said that she had known the prisoner about five years; that on the 16th day of June, A. D. 1851, the deceased, Caroline Scholton, came into her room and told her she had been out where John was, and he had told her he wanted to tell her something; that he had loved her, and wanted her to take a letter from him, and that she told him she would not hear him, nor take his letter; but that he (defendant) must wait and say whatever he wanted to say in the presence of the family; that witness told her to go back and hear what John had to say, and receive his letter; that deceased went back and told John she would take the letter, and hear what he had to say; that John told her he would keep the letter safe; that deceased then returned and sat down on a trundle bed; that soon after, as witness came into the house, the defendant had the gun in his hand, in the porch, fixing the priming; that witness went into the house and sat down near the deceased on the same bed, with her little child between them, and soon thereafter the defendant came to the door, with the gun in his hand, and says, "*this is for your pride;*" that deceased begged him not to shoot, and witness did the same, but that defendant shot her; first, with one barrel, and then with the other;

that deceased fell back, and that witness took up the child and ran to the house of a neighbor, (Eli Johnson.) As witness went off, she saw defendant throw down the gun and go to the stable lot. After he got to the lot, she heard the small report of a gun or pistol in the lot, and heard some one hallooing, which she took to be John. As she left, she saw blood on her child's face, which she washed off. The witness said that the defendant had lived with us about five years, and the deceased had lived with us about one and a half years, and both were living with us at the time of the killing. The deceased was about twenty-one years old; that there was no one about the house except those named by her before; that defendant had always been a quiet, peaceable man, up to the killing, so far as she knew.

The State then introduced George Sheirekamp, who stated, on Sunday, which was the day before the killing, he went to Mr. Scholton's to put in some windows for him; that after working a while, he and John started down the river to see some fish hooks they had set out; that as they went along, defendant said he had for a long while wanted to see him; that he loved Caroline Scholton much; that the first chance he got, he would ask her to have him; if she refused, he intended to shoot her dead and then kill himself; that he (the witness) told him he had been young and loved the girls, but that he never thought of such a thing. Defendant said that witness had told him of that often enough; that he (witness) had never loved girls much, but he should hear more about it. Caroline was killed on the Monday, and when witness was making her coffin at Mr. Quick's, on Tuesday, the defendant was lying on the bed, and asked witness if he (defendant) was too mean for him to come and see any more. He (witness) then went to defendant and asked him whether he shot deceased by accident or aforethought, and that witness replied he did it aforethought or willingly. On cross-examination, this witness said, he did not tell the family of Scholton what John (the defendant) had said about the deceased, when they went back

from the fish hooks, because he thought John was jesting. At the time witness saw John at Quick's, he had his left arm bandaged, and a poultice on his breast. Witness cannot recollect any thing else that occurred on the day they went to see the fish hooks : he thought defendant jesting when he spoke as he did. Witness spoke of the first conversation he had with the defendant as soon as he heard of the murder.

James Nunnally, a witness for the State, testified that he arrested the defendant, and after telling him the charge made against him, he asked him whether he was guilty or not; the defendant replied guilty, and said he was sorry for it. Witness said he (witness) explained to him the nature of the charge made against him, and he said he was guilty, and that he had killed deceased because she would not accede to his proposition.

Mr. Barking was then introduced as a witness for the State, who said, that, on the day of the killing, I went to Scholton's and found the deceased had fallen off from the bed and lying rather on her back, with seventeen buckshot holes around her right eye and forehead ; the shot had passed through her head, and some of the brains protruded at the back of her head. Cross-examined, said he saw the defendant on the day after the killing had taken place : he labored under much excitement ; showed much emotion ; his chin quivered, and he wept : he said he was sorry he had committed the act. Witness saw a wound on the stomach of the defendant, that appeared to be produced by powder ; it was black. Defendant also had a cut across the left wrist; this cut was bandaged, and the wound upon the stomach had a poultice applied to it.

The wounds or scars on the defendant were then shown to the jury. They consisted of a scar quite across the left wrist, over the pulse, which seemed to have left a knot. The scar upon his stomach was perceivable. This was the material evidence in the case ; nothing of importance further given in evidence by either party. The defence relied upon was insanity.

The court then gave the following instructions for the State :

State *v.* Huting.

1. If the jury believe from the evidence, that the prisoner formed a determination, in his own mind, to kill Caroline Scholton; that this determination was deliberately formed before the act of killing took place ; and that after such determination was so formed, he did, in pursuance thereof, commit the act of killing, in the manner charged in the indictment, then the prisoner is guilty of murder.

2. If the determination to kill the deceased existed in the mind of the prisoner before the act of killing took place, and such determination was deliberately formed ; and if such determination is proven to the satisfaction of the jury by evidence other than the act of killing, then this will constitute murder in the first degree.

3. If the jury find from the evidence, that the prisoner, at the time he committed the act of killing, was so insane as not to be capable of knowing that the act was criminal, then he is not responsible for his act, and the jury should acquit him.

4. To constitute insanity a good defence, the jury must find that the prisoner was so far insane as not to be capable of knowing that the act committed was criminal.

5. If the jury should believe from the evidence, that the prisoner was deeply in love with Caroline Scholton, the deceased, and desired to marry her, and that he killed her in a fit of jealousy, because she refused to accept his addresses, or marry him, this is a criminal act ; and if the determination to kill her for that cause was deliberately formed before the act of killing took place, then such killing is murder ; and if the jury find that such determination to kill her for the cause stated is proven to the jury by acts or declarations of the prisoner, other than the act of killing itself, then it is express malice, and constitutes murder in the first degree.

The defendant excepted to the giving of these instructions. The defendant asked and the court gave the following instructions :

1. To convict the defendant of murder in the first degree,

the jury must be satisfied, from the evidence, beyond a reasonable doubt, that he is guilty of murder in the first degree.

2. To convict the defendant of any offence less than murder in the first degree, the jury must be satisfied, from the evidence, beyond a reasonable doubt, that he is guilty of such offence.

3. If the jury have a reasonable doubt as to the guilt of the defendant, they must acquit, by returning a verdict of not guilty.

4. That a person may be insane on one subject and sane on all others.

5. That if the jury believe from the evidence, that the defendant was so far insane on the particular subject that brought about the death of Caroline Scholton, as not to know the act was criminal at the time he done the deed that produced her death, then they will return a verdict of not guilty.

6. That to find the defendant guilty of murder in the first degree, the jury must believe from the evidence, beyond a reasonable doubt, that the killing was done wilfully, deliberately, premeditatedly, and with malice aforethought.

7. Insanity, like any other fact in the case, may be proved to the jury by circumstances—positive proof is not required.

The counsel for the prisoner, in this court, rely mainly on two grounds for a reversal of this judgment. The first one of which is, that the court below erred in overruling the defendant's motion to discharge the prisoner, because he had not been brought to trial in due time, according to the laws of the land. The second ground is in relation to the subject of insanity. The instructions given by the court to the jury on that subject, the defendant's counsel contend are not the law, and, consequently, it was error for the lower court to give them. We will notice these several grounds at large.

And, first, as this case involves the life of a fellow-being, we will state particularly all the important facts, as we have seen them sent up to this court, whether certified and forming part

of the record proper or not, and give to the defendant all the benefit he could legally have derived from such matters, if the same had been duly saved by exceptions and properly certified. I make this observation, in order to let the counsel for the prisoner and the public see that in such cases this court will never rest its judgment and decision in matters so fatally serious as this case presents, by affirming barely on technical niceties and omissions in the record.

The record proper contains nothing on which the first ground relied on by the defendant's counsel for the reversal of the judgment can be made to appear. There is nothing in it, as appears by this record. The motion filed at April term, 1854, for the prisoner's discharge, and the causes therein set forth for such discharge, without any proof of the facts on which such motion is based, do not afford ground on which this court should reverse.

The following is the motion filed by the prisoner's counsel : " That defendant moves to be discharged upon the ground that he was not brought to trial before the end of the second term of this court, which was held after the indictment against him was found, and because such delay was not occasioned by the application of said defendant, and was not occasioned by the want of time to try said cause at said second term." The bill of exceptions merely shows this motion was made and was overruled, and was excepted to by defendant. No facts offered in proof—no negation of the causes for overruling the motion, as are provided for by the statute. Indeed, nothing but the motion and its being overruled.

This court cannot take notice of the causes merely stated by motion, without any proof of their existence. We must presume that the lower court properly, and for good reasons, refused to sustain this motion ; and, whether such really existed or not, the party complaining must so state, and save the facts in proof, that this court can, from the record, see whether the inferior court has abused its discretion, or has acted erroneously in regard to such motion. The motion, by itself, is no proof

of the existence of the causes on which it relies for the sanction of the court. Let us now see if the record shows any proof of the causes set forth in the motion by a more particular examination of it. We have said the record proper contained nothing to support the motion; but this may seem assertion rather than investigation. We will dissect it and see.

But, first, let us consider the statute on which this motion is based, before we particularize in regard to the record. The 25th section of the 6th article of the act concerning practice and proceedings in criminal cases, (R. C. 1845,) is as follows : " If any person indicted for any offence and committed to prison, shall not be brought to trial before the end of the second term of the court having jurisdiction of the offence, which shall be held after such indictment found, he shall be entitled to be discharged, so far as relates to the offence for which he was committed, unless the delay shall happen on the application of the prisoner, or shall be occasioned by the want of time to try the cause at such second term." The 26th section, which follows, embraces persons indicted, but on bail, and fixes the end of the third term instead of the second. The 27th section is as follows : " If, when application is made for the discharge of a defendant, under either of the two last sections, the court shall be satisfied there is material evidence on the part of the State, which cannot then be had; that reasonable exertions have been made to procure the same, and that there is just ground to believe that such evidence can be had at the succeeding term, the cause may be continued to the next term, and the prisoner remanded or admitted to bail, as the case may require."

By the statute prescribing the times of holding the courts in the several circuits of this State, the Circuit Court for the county of Pike is held on the first Mondays in April and September; for the county of Montgomery, on the second Mondays in April and September; for the county of Warren, on the third Mondays in April and September; thus allowing one week to the Circuit Court of Montgomery county.

State *v.* Huting.

Now the record before us shows that this indictment was found and returned by the grand jury of Montgomery county, at the September term, 1851. It also shows that there was no court at the April term, 1852—the judge's illness caused the term to lapse. At the September term, 1852, the trial was commenced, and by reason of the judge's illness the court adjourned; the jury, in this case, being discharged. Neither of these terms can properly be counted as terms, in regard to this prisoner, or in his favor, under this statute. It was not designed for such cases. When there was no court, or when the court had to adjourn until a subsequent day, by reason of the illness of the judge, it must be regarded as affording no sufficient time for the trial of causes ; and, in our view of the statute, the prisoner, in jail or out on bail, cannot take advantage of such circumstances and move his discharge. On this motion, therefore, the court properly refused to consider these as terms of the court under this statute. At the April term, 1853, a jury was empannelled, and the trial was had ; but the jury not being able to agree on the verdict, the court discharged the jury and remanded the prisoner. This was in accordance with the 10th section, 13th article of the state constitution : " If, in any criminal prosecution, the jury be divided in opinion at the end of the term, the court before which the trial shall be had, may, in its discretion, discharge the jury and commit or bail the accused for trial at the next term of such court." This term, then, cannot be counted in favor of the prisoner. All that could be done, in order to have his trial, was done at this term ; there was no delay on the part of the State. The division in opinion of the jury was, at the end of the term, the reason for their discharge ; and, at the end of the term, there remains no time sufficient for any other trial at that term. So, if the prisoner complains of the delay at this term, it may be answered that, after what was done, in order to have a trial, and that trial proved unavailing, there was, emphatically, a want of time, or rather there was no time at that term to retry the cause.

At September term, 1853, the case was called for trial, and the record shows that on the fourth day of the term, the court being unable to empannel a jury, having only five jurors sworn up to that day, discharged those five jurors, continued the case, and remanded the prisoner. This term also cannot be counted for the prisoner; there was no trial at this term truly because there was no time to try the cause. The term consists of six days, and on the fourth day, not half of the jury empannelled. It might have taken the remaining two for the sheriff to have summoned persons from whom the pannel could have been completed. At all events, the court, satisfied that there was no power in the court at that term to complete the jury, adjourned the cause, because it was not able to get a jury; this delay, then, at that term, was because there was want of time to try the prisoner. At the next term, the trial was had, and the unfortunate man was convicted.

The amended record shows that a special called term for the trial of the prisoner, John Huting, was held by the judge on the 14th day of June, A. D. 1852; but it also shows that the court adjourned the same day without making any mention of the case of the State *vs.* John Huting. It also shows that the September term, A. D. 1852, was adjourned over until the 20th day of December, 1852, and that this adjourned term closed on the 30th day of December, 1852, without any mention being made of the case of the State *vs.* John Huting.

There is also a paper not certified, but made out by the son of the clerk of the Circuit Court, giving his private statements of some reasons why there was no trial of the prisoner at the special terms. This document has been examined by us, in order that we might clearly see what had been done in the progress of this case; whether any injury had been caused to the defendant. We do not sanction such a transcript, nor would we regard it as affording any evidence in the cause of what had taken place in the court below; but, being a case involving the life of the defendant, we looked into it, in order to see if any other or further steps, to procure a full and complete transcript

of what was done at the special terms, was necessary. But taking all the transcipts in the case, which have been made out as the full record, and we come to the conclusion that there was no good and sufficient reason why the court below should have sustained the defendant's motion for a discharge.

We do not think that special or called terms of the Circuit Court are within the 25th section of the statute, above quoted. The legislature meant regular terms, not special terms, for the trial of criminal business, under certain emergencies.

The law was passed to protect prisoners, and afford them a speedy trial. If, therefore, the State should indict a person, and confine him in the prison of the county, or cause him to give bail, as the case might require, and should afterwards take no steps to bring the accused to trial, and should thus lie by and do nothing until the end of the second term after that at which the indictment was found, such delay and neglect, on the part of the State, should authorize and justify the discharge of the accused from imprisonment and from such offence. But such cannot be the case when every exertion is made for trial, and yet, from causes beyond the control of the State, the trial shall be delayed.

We have weighed well this objection, and, in our view of the case, this record does not support it, nor even offer any plausible ground for it.

On the second ground relied upon for reversing the judgment below, the law is equally clear against the prisoner.

The court gave all the instructions asked for by the State, and all asked for by the accused. The defence turning wholly on the insanity of the defendant, the court told the jury, that, " if they believed the defendant was insane upon the particular subject, so as not to know that the act done was criminal, he must be acquitted."

In relation to the proof of insanity, the court instructed the jury that " insanity might be proved like any other fact—positive proof not being required."

Without reference to the numerous decisions on this subject in the English courts, and also in the courts of our own country, I will notice a few leading principles and rules which the cases furnish, and apply them to the case before the court. Where insanity is interposed as a defence to an indictment for an alleged crime, the inquiry is always brought down to the single question of capacity to distinguish between right and wrong, *at the time when the act was done*. This is the rule laid down by all the English judges but one, in the late case of *McNaughten*, while pending in the house of lords. See case reported in Clark & Finnelly, (10th vol. p. 210.) See *Freeman* v. *The People*, (4 Denio, 29.) The insanity must be such as to deprive the party charged with the crime of the use of reason *in regard to the act done*. The prisoner may be deranged on other subjects, but, if capable of distinguishing between right and wrong in the particular act done by him, he is justly liable to be punished as a criminal. Such is the undoubted rule of the common law on this subject. Partial insanity is not by that law necessarily an excuse for crime, and can only be so where it deprives the party of his reason in regard to the act charged to be criminal. (1 Archbold's Crim. Prac. p. 10, 11.)

The instructions here given brought down the question of insanity in regard to the act done. If the prisoner had been sane on all other subjects, and yet not able to know whether the act charged against him was right or wrong, owing to some morbid and diseased hallucination of the mind upon the very subject, the jury were instructed to find him not guilty. The court also informed them that insanity was like any other fact in proof—it did not require positive proof—but might be proved by circumstances.

The defendant's counsel contend that the court should have told the jury, that, if they had a reasonable doubt of the insanity being made out by the proof in the case, they ought to find for the prisoner. This is carrying the doctrine too far. In-

sanity may be made out by circumstantial proof; it does not require positive proof; but the jury must believe from the evidence, at least, that it exists.

If the jury have a reasonable doubt of the guilt of the defendant, they are to acquit. If the State makes out but a doubtful case, the jury will acquit. But this doctrine of doubt has not been carried to the extent, that, if the defendant makes out but a doubtful defence, they must acquit.

In looking over the whole number of instructions given by the court in this case, we are satisfied that the court laid down the law as favorably, if not more so, than the facts warranted for the defendant. The case has been fairly submitted, under instructions more favorable to the accused than the law strictly admitted, and he has been found guilty. This court has nothing left but to affirm the judgment of the Circuit Court, and to order that the judgment be carried into execution.

The other judges concurring, the judgment below is affirmed.