THE STATE V. JAMES T. TRAYLOR, Appellant.—98 S. W. (2d) 628.

Division Two, November 17, 1936.

*I. Joel Wilson* and *J. R. Weinbrenner* for appellant.

*Roy McKittrick*, Attorney General, and *Frank W. Hayes*, Assistant Attorney General, for respondent.

LEEDY, J.—By information filed in the Circuit Court of the City of St. Louis, appellant was charged with murder in the first degree, in having shot and killed one Timothy Lahart. Upon a trial he was found guilty of murder in the second degree, and his punishment assessed at imprisonment in the penitentiary for a term of fifteen years. He was sentenced accordingly, and in due course appealed.

The evidence on the part of the State tended to show the following: That the alleged homicide occurred at 2938 Chouteau Avenue in St. Louis about six or six-thirty P. M., on January 8, 1931. De-

ceased Timothy Lahart (hereinafter referred to as "Tim") was about thirty-four years of age. In partnership with another, he conducted a restaurant or tavern at the address mentioned. The restaurant faced north, and it consisted of a front room, a middle room, and a kitchen, with a yard in the rear on the south. The doorway connecting the front room and the middle, or smaller dining room, was located about in the center of the partition running east and west between the two rooms. There was a lunch counter and stools on one (the east) side of the front room, and dining tables and chairs on the other (west). The middle room was a smaller dining room. At the time mentioned, appellant entered the restaurant, walked back to the door between the front and middle rooms when and where the shooting immediately ensued. He passed a table at which Mike Lahart, a brother of deceased, and one Daisy Weber were seated, which was the second one north of the partition. Tim was shaving, or wiping his face, and was using a mirror attached to the north side of the partition mentioned. He was facing south, and was in his shirt sleeves. George and Joseph Borich, brothers, were seated at stools at the counter. Frank Polito was in the kitchen. All of the persons mentioned testified as witnesses for the State. Mike Lahart testified that while sitting at the table, he was facing south, "toward Tim's back," and within ten feet of Tim, when "a man walked by me, but I didn't pay any attention to it . . . and a couple of seconds after he got by me I heard some words. . . . I didn't understand the words, and the next thing I knew there was a shot fired, and I looked up, and just as I looked up I seen my brother grab himself like that (indicating). . . . He had grabbed himself, and the man was passing him, with his back to me, and in another instant, why my brother started to go back through that gangway, and the man followed him, and I heard more shots;" that he heard four or five shots fired in quick succession; that not over two seconds elapsed from the time the man passed his table until the first shot was fired; that deceased was found "at the back door on the steps, unconscious." George Borich testified that he was sitting on the front stool at the counter; that he saw a man enter at the front door, with both hands in his overcoat pocket; that the next thing that attracted his attention was the report of a shot, whereupon he saw Tim "stoop over," and he, the witness, ran out of the place; that he heard no words between them preceding the shooting, and that he heard two or three more shots as he was running away. Joseph Borich was likewise sitting at the counter, and was engaged in reading a paper; he saw a man enter the place, slam the door, and "walk towards the back;" he saw Tim shaving or wiping his face in front

of the mirror; his attention was next attracted by hearing a shot, and saw Tim "double over;" the man he had seen enter was standing in front of Tim after the shot was fired; he heard "a few words"—heard someone say it was a small world, and the shot was fired right after that; whereupon the witness ran out on the street, and then heard more shots fired. Daisy Weber testified she was seated opposite Mike Lahart at the table, and was eating, she noticed someone enter and pass the table. To quote (with explanatory matter in parentheses): "They (appellant) pulled a gun out of their (his) pocket, and I thought he was going to give it to Tim, and he (appellant) said 'It is a small world,' and he (Tim) turned around and said, 'What's the matter?' and a shot was fired, and he (Tim) leaned over and ran to the back." The witness had heard no quarreling or anything to attract her attention up until she heard the remark about it being a small world. She further testified that when Tim "ran to the back" the man who had done the shooting followed him, and she heard two or three more shots fired. Polito was in the kitchen, and heard the report of the pistol. He saw Tim run through the kitchen "holding his hands on his stomach," and a man following him firing an automatic pistol. Three empty shells from a .30 Lugar automatic pistol were found—two in the middle room, and one at the basement entrance. Tim was taken to a hospital, where he died that night. He had sustained several bullet wounds, one of which had fractured the sixth vertebra and he was suffering with paralysis of the limbs; a chest wound was, in the opinion of the coroner, the mortal wound. There was strong evidence of flight on the part of appellant, and he was not apprehended until July, 1933. There was evidence, not necessary to relate, tending to adversely affect the credibility of Mike Lahart and Daisy Weber.

On the part of appellant, numerous witnesses testified to his good reputation as a peaceable, law-abiding citizen. It was shown in his behalf that appellant's wife was living with Tim over the restaurant where the shooting occurred. His wife so testified. Appellant testified to having received by mail an unsigned note, in the handwriting of his wife, of which the following is a copy: "Dear Jim: Please meet me at 2938 Chouteau Thursday." He testified that he went to 2938 Chouteau in response to such request; that he had no idea Lahart was there, but that he went there with the intention of finding someone to speak to Marie, his wife; that he entered, and saw no one he knew, and then walked toward the kitchen, "and I got to the partition leading into the rear part of the restaurant, and a man came out, and he says, 'It's you.' I says, 'Is Marie here?' He says, 'What do you care?' And at that he reached around the partition and came out with a pistol, and when he

came out with the pistol I shot at him. Whether I shot him, I don't know.'' To quote: ''Q. And then what happened? A. He turned sideways, his left side to me, and his gun was toward his stomach, and he shot upwards directly into my face, and I fired at him again, and simultaneously somebody behind me shot at me, and I grabbed over at this man, and he dropped his gun, and I ran after him to the rear of the restaurant. Q. Where was he when he dropped his gun? A. Just inside of the rear partition. Q. I don't understand exactly that. There was a little room back of the main restaurant there, wasn't there? A. Yes, sir; of some sort. I didn't have time to look at it. Q. Was it dark in there? A. It was dim lights. Q. He then ran out through the kitchen? A. Yes, sir; and I followed him. Q. And you followed him out? A. Yes, sir. Q. After he dropped his gun, did you shoot him any more? A. No, sir.''

On cross-examination he elaborated on his narrative, and testified to having been cursed by Tim. It appears that, when apprehended, he made a statement to the police, in which he admitted the shooting, but denied the statement contained all that was said. Appellant's wife testified the note was not in her handwriting, but had been written by Tim in order to get appellant to come to his (Tim's) place so he ''could take care of him.''

I. The only questions briefed on this appeal, and urged for a reversal, relate to the matter of instructing on the law of self-defense. On the part of the State, the court gave Instruction No. 6 on that issue, which appellant says is inadequate and insufficient, and that his refused Instruction C correctly declared the law, and, therefore, should have been given. The two assignments made in that connection are overlapping, and so will be treated together.

The instructions are, respectively, as follows:

### State's Instruction No. 6:

''The defendant admits the shooting but claims that he acted in self-defense. Upon this question the court instructs you that if you find from the evidence that when defendant shot Timothy Lahart he had reasonable cause to believe and did believe that said Timothy Lahart was about to take his life or do him some great personal injury, and further, that he had reasonable cause to believe and did believe that it was necessary for him to so shoot said Timothy Lahart in order to protect himself from such danger, then he ought to be acquitted on the ground of self-defense. Whether defendant had reasonable grounds, to believe that such danger existed, and whether he shot said Timothy Lahart in the honest belief that it was necessary for the protection of his life or person are questions which you must determine from all the evidence in the

case. Although defendant may have really believed himself to be in danger, yet he cannot be acquitted on the ground of self-defense unless it further appears from the evidence that he had reasonable cause for such belief. On the other hand, even if no real danger existed, yet if defendant had reasonable ground to believe and did believe that it existed, he would be justified in acting upon such belief. If you believe from the evidence that the defendant shot the said Timothy Lahart unnecessarily, and when he did not have reasonable cause to believe that the said Timothy Lahart was then about to kill him or do him some great bodily harm or personal injury, then there is no self-defense in the case and you cannot acquit the defendant on that ground.''

### Refused Instruction C:

''Upon the law of self-defense, the jury are instructed that if the defendant, at the time he shot the deceased, had reasonable cause to apprehend, and did apprehend, that the deceased was about either to kill or to do him some great bodily harm, and that the danger of his doing either was imminent, and that the defendant shot to avert such apprehended danger, then such shooting was justifiable and you should acquit on the ground of self-defense. And in this connection the jury are instructed that it is not necessary, in order to acquit on the ground of self-defense, that the danger should, as a matter of fact, have been real or actually impending; all that is necessary is that the defendant had reasonable cause to believe and did believe that the danger was real and about to fall upon him; and, if the defendant acted in a moment of what to him appeared to be impending danger from an assault by the deceased, it was not necessary for him to nicely measure the proper ·quantity of force necessary to repel the assault; and the question for you to determine is, not what you think it was necessary for the defendant to have done or not done at the time he shot deceased, but the question is what the defendant might have reasonably believed was necessary for him to do under all the circumstances.''

Each of these instructions is in a form approved by this court. The form of Instruction No. 6 finds approval in the case of State v. Williams (Mo.), 274 S. W. 50, and cases therein cited. Instruction C is a duplicate of one set out in the reported case of State v. Aurentz (Mo.), 263 S. W. 178.

The first criticism is directed at the last paragraph of Instruction No. 6, which is said to be fatally erroneous ''for the reason that it announces the principle that if one kill his adversary unnecessarily he forfeits his right of self-defense, thus negativing his right to act upon appearances.'' The exact language complained of was considered in State v. O'Leary (Mo.), 44 S. W. (2d) 50,

where it was said that "had there been no qualification of the word 'unnecessarily,' and nothing further to limit its effect, the instruction would be bad," but, when taken in connection with the whole sentence of which it was a part, i. e., "and when he did not have reasonable cause to believe (his adversary) was then about to kill him or do him some great bodily harm or personal injury" it was construed as denying defendant the right of self-defense only if he shot unnecessarily *and also* without reasonable cause to believe it was necessary. And we so hold.

It is further said, "It was error to fail to direct the jury in this instruction that defendant had a right to act upon appearances." True, it does not use the term "appearances" (nor, it may be pointed out, does refused Instruction C), but it does say that "even if no real danger existed, yet if defendant had reasonable ground to believe and did believe that it existed, he would be justified in acting on such belief." This, we think, is substantially equivalent to the stock phrase usually employed in that connection, and in the absense of a more specific request, is sufficient.

It will be necessary to notice only one of the two remaining grounds briefed on the refusal to give Instruction C. It goes to the proposition that it was error to fail to tell the jury it was not necessary for appellant to nicely measure the proper quantity of force necessary to repel the assault.

The State invokes the rule that it is not error to refuse instructions offered by a defendant where the subject matter has already been fully covered by instructions given by the State; and argues that as the court, by Instruction No. 6, had fully instructed on the issue of self-defense it was not error to refuse Instruction C. The doctrine that one is not required to nicely gauge the amount of force to be used in repelling an assault, under the circumstances of this record, is supported by numerous authorities, and is not questioned by respondent. The necessity of instructing on that particular phase of self-defense, when requested, seems to have been definitely settled in State v. Creed, 299 Mo. 307, 252 S. W. 678, a case not directly called to our attention in the briefs. It was there said: "Where either the right of self-defense, or imperfect self-defense, is involved, and the assailing party is possessed of an instrument that the defendant might reasonably consider deadly or capable of doing great bodily harm, and has reasonable grounds to fear or suspect its consequential use, the defendant is not required to nicely gauge the amount of force to be used in defending himself. The legal requirement is that of good faith only, and does not demand perfected judgment. We therefore think the court should have given an instruction embodying that principle. [State v. Hopkins, 278 Mo. 388, 1. c. 394, 213 S. W. 126.]" In view of this holding,

it is clear that it would have been error to have refused an instruction which embodied only the particular matter about which complaint is here made—that of nicely gauging force, etc. Bearing in mind the rule with respect to a defendant formulating and requesting a proper instruction, can it be said that because the particular matter to which he is entitled may be coupled up with other matter on which the court has already instructed, that he thereby loses his right to have the jury instructed on such particular matter? We have been cited to no cases so holding. While the better practice would be to limit it to the particulars sought, we think, in this instance, the offer of Instruction C was sufficient as a request for an instruction on the subject of nicely gauging force, and appellant being entitled thereto, it was reversible error to refuse to instruct thereon. The judgment is, accordingly, reversed, and the cause remanded. All concur.