STATE OF MISSOURI, Respondent, v. CLAUD MCGEE, Appellant, No. 41637—234 S. W. (2d) 587.

Court en Banc, November 13, 1950.

Rehearing Denied, December 11, 1950.

Lester G. Seacat for appellant.

*J. E. Taylor,* Attorney General, and *David Donnelly,* Assistant Attorney General, for respondent.

[588]  HOLLINGSWORTH, J.—Defendant-appellant was convicted of the deliberate murder of John Manor and his punishment was assessed at death.

The grounds of his appeal are (1) unconstitutionality of the law of Missouri that makes the test of responsibility for crime, where insanity is pleaded, to be knowledge that the act was wrong; (2) failure of the court to instruct on the law of self-defense; (3) prejudice created by defendant's attempt to escape while the jury was deliberating on its verdict; and (4) improper consideration by the jury of parole laws and practices.

Defendant and Manor were convicts confined in the state penitentiary. Both were serving terms of life imprisonment for murder in the first degree, defendant having entered in 1937 and Manor in 1938.  The record is not entirely clear, but fairly inferable that their convictions were for the same murder.  Both had escaped from the prison after their commitment and had been confined in "E-Hall", a disciplinary cell block.

During the noon hour of January 10, 1948, the convicts of the penitentiary, supervised by guards, were at leisure in the recreation yard. Manor, who had been to the commissary, was standing with his hands in his pockets and facing eastward. Defendant was standing some fifteen to twenty feet back of Manor and also facing eastward. Thus, Manor's back was to defendant. Suddenly defendant rushed toward Manor and, as he did so, dropped a claw hammer out of his sleeve into his right hand and struck at Manor from the rear. The hammer missed Manor's head. Manor threw his head backward and looked toward defendant. Defendant then struck him across the bridge of the nose with the claw part of the hammer, and he sank to the ground. As Manor fell, defendant struck him twice on the crown of the head with the other end of the hammer head. Two guards rushed up and defendant struck at them and ran toward the tower gate, which was open. As he ran, he threw the hammer over a fence into some weeds. The tower gate was closed before he reached it, and he stopped running. He was seized by the guards, taken into a building and questioned. He said, "I had to get him (Manor) before Manor got me", and, "Well, it was either that or he would have got me".

When Manor was assaulted, he had no weapon and apparently was unaware of defendant's presence. Defendant admitted that the hammer had been in his possession, and he had kept it in his cell, since Christmas of 1947.

All three of the blows inflicted upon Manor entered the brain area and any one of them would have caused death. He died within a few minutes.

The evidence in behalf of defendant's plea of insanity tended to show that from childhood defendant had unreasoning fits of temper, during which times he was dangerously violent. His prison record, introduced in support of his plea of insanity, revealed a life sentence for murder, an escape from prison, and a conviction for kidnapping.

On February 7, 1947, following an illness at the prison hospital, defendant was taken to State Hospital No. 1 at Fulton. There he was found to be suffering from a mental derangement. The diagnoses of the several staff physicians differed and ranged from that of a relatively mild psychopathic [589] condition to schizophrenia of a mixed paranoic and catatonic type. Electric shock treatments were administered and he gradually improved. On September 17, 1947, it was the consensus of opinion of the medical staff that he was in a state of "remission", that is, mentally normal and free from any symptoms of insanity, and he was transferred back to prison.

It was further shown that persons suffering from schizophrenia of the mixed paranoic and catatonic type are unpredictable and

dangerous. They may impulsively kill as a result of their delusions and imaginary wrongs, even though they know they are doing a moral and legal wrong. There was no testimony that defendant suffered any insanity after his discharge from the state hospital, but such persons frequently suffer relapses.

The issue of insanity was submitted under an instruction that has been many times approved in substance by this court. Insanity, such as would authorize an acquittal on that ground, was defined as "a physical disease, located in the brain, which disease so perverts and deranges one or more of the mental and moral faculties as to render the person suffering from the affliction incapable of distinguishing right from wrong, in reference to the particular act charged against him, and incapable of understanding that the particular act in question was a violation of the law of God and society at the time of its commission." The jury was further instructed: " . . . if you believe and find from the evidence that the defendant, Claude McGee, struck, beat and killed John Manor, as set forth in Instruction No. C-4, and that at the time he did so he was so perverted and deranged in one or more of his mental and moral faculties as to be incapable of understanding that such striking, beating and killing were wrong, and that he, the defendant, at such time was incapable of understanding that such striking, beating and killing were a violation of the laws of God and society, you must find the defendant not guilty by reason of insanity." Such is the long established and many times reconsidered and reaffirmed rule of this court. State v. Huting, 21 Mo. 464, 476; State v. Jackson, 346 Mo. 474, 142 S. W. 2d 45, 49; State v. Sapp, 356 Mo. 705, 203 S. W. 2d 425, 430-431; State v. Hardy, 359 Mo. 1169, 225 S. W. 2d 693, 698.

Defendant finds no fault with any part of the trial court's instruction on insanity other than the limitation of the defense of insanity to defendant's ability to know right from wrong. Defendant's proffered (and refused) instruction D-8 included substantially the same definition of insanity as the instruction given by the court, but went further and included an additional definition or test, towit: " . . . that his mental faculties were so impaired by disease of the mind that he could not restrain himself from doing the act and was impelled thereto by an insane impulse which was a direct and proximate result of such disease." In this manner we are again asked to review and reverse our former decisions that the doctrine of "volitional insanity" or "irresistible impulse" is not recognized in this State. See State v. Jackson; State v. Sapp; State v. Hardy, all supra.

Defendant's attack on these decisions is new and novel. It is that the so-called "right and wrong" rule, as announced in our decisions, is unconstitutional, in that it violates (a) the due

process clauses of the federal and state constitutions; (b) the constitutional restrictions against the infliction of cruel and unusual punishment, as set forth in the federal and state constitutions; and (c) denies defendant equal protection of the law as guaranteed by both our federal and state constitutions. Defendant's counsel ably and ingeniously argues these contentions through some thirty pages of his brief. He frankly concedes, however, that the constitutional status of this rule, which is of judicial origin, arising out of the common law, has never been raised either in Missouri or elsewhere; and after diligent search we are unable to find any case or any authority that supports or tends to support his contention. We have read with painstaking diligence all of the cases cited by defendant and find none of them in point. They are: State v. Julow, 129 Mo. 163, 31 S. W. 781; [590] State v. Walsh, 136 Mo. 400, 37 S. W. 1112; State v. Miksicek, 225 Mo. 561, 125 S. W. 507; Skinner v. State of Oklahoma, 316 U. S. 535, 62 Sup. Ct. 1110, 86 L. Ed. 1655.

There seems to be a complete absence of authority on the subject. The mere fact that never heretofore in either American or English jurisprudence, insofar as we have been able to find, has the constitutionality of this rule been challenged is persuasive argument that it is not susceptible of challenge.

The presumption of the constitutionality of long acquiesced in statutes would seem to be analogous here. This rule is aptly stated: "The length of time that a statute has stood without any attacks on constitutional grounds is a factor which sometimes influences the court in upholding its constitutionality. The question of constitutionality cannot, however, be regarded as settled if the question has never been raised in the courts. The presumption of validity which applies to legislation generally is fortified by acquiescence through a number of years. The fact that for a period of eighty-two years the constitutionality of a statute considered in many cases by the highest court of the state has not been questioned is persuasive, if not convincing, evidence of its validity. This principle has also been applied in the upholding of statutes the constitutionality of which was not attacked until after sixty years, nearly sixty years, fifty years, forty-five years, forty years, thirty years, nearly a quarter of a century, and even twenty years." 11 Am. Jur. § 83, p. 705.

Even the layman knows that there are many and varying types and degrees of insanity; knows that some types and degrees of insanity constitute moral and legal excuse for the commission of acts which, but for the insanity, would be criminal, knows that many persons who suffer some mental derangement are morally and legally responsible for acts done in violation of criminal law.

Utter chaos would result if the juries were permitted to establish and follow their ideas of the extent of the insanity that would constitute an excuse for an otherwise criminal act. The orderly administration of justice requires a rule or test of the degree of insanity that will excuse. Of course, the rule and test must be reasonable according to the experince of mankind. The rule in force in Missouri was adopted in England in Daniel M'Naghten's Case in 1843. Eng. Reports, Vol. VIII, page 738. It has been consistently followed in Missouri since the case of State v. Huting, supra, decided in 1855. It is now the law in a majority of the states of this Union. See Annotation, 70 A. L. R. 659.

Furthermore, all who come within the rule are entitled to acquittal on any criminal charge. The penalties and immunities are visited alike upon all persons charged with crime as their mentality measures above or below the standards prescribed. Equal protection of the laws is thereby afforded both the public and all who are accused of crime.

Considering its historical background and for the reasons stated, we hold that the test of insanity as an excuse of the commission of an otherwise criminal act as heretofore defined and applied by the courts of Missouri does not violate the ''due process'' or ''equal protection of law'' clauses of either the federal or state constitutions.

Inasmuch as we have sustained the rule as against the contentions of its unconstitutionality, it follows as a matter of course that the punishment assessed by the jury does not violate the constitutional inhibitions against infliction of cruel and unusual punishment. Section 4378, Mo. R. S. A. fixes the punishment for murder in the first degree at death or imprisonment in the penitentiary for life. It is not contended, and, indeed, could not be, that the evidence did not make a submissible case of murder in the first degree. Fixing of the punishment for crime is a legislative and not a judicial function. State v. Copeland, 335 Mo. 140, 71 S. W. 2d 746, 752.

Several of his fellow convicts testified in support of defendant's plea of self-defense. [591] According to this testimony, defendant borrowed twenty dollars from Manor in December, 1946. Shortly thereafter Manor began to demand forty dollars in settlement of the loan, and bad blood arose between them. One witness testified that defendant and Manor met in the prison yard sometime after defendant's return from the state hospital on September 17, 1947, and Manor pulled a knife from his clothing and threatened defendant, telling him that he wanted his money. Another testified that shortly after defendant was returned to the prison and while he was in quarantine awaiting assignment to a cell, Manor said that he was going to try to have defendant assigned to ''E-Hall'' so that he (Manor) ''could take care of him''. Another testified

that on the "yard day" prior to the killing Manor chased defendant across the yard with a drawn knife and told him he was going to kill him if he didn't pay "forty dollars for twenty dollars". Another testified that on the morning of January 10, 1948, he and defendant observed Manor near the chapel and that he, the witness, went across the yard to Manor and told Manor that he would give him twenty-five dollars to tide him over, to which Manor replied "he was going to get Claud's (defendant's) money or else", and that at that time the witness saw an object that resembled a knife bulging from Manor's shirt.

The law of self-defense may imply the right of attack when it appears reasonably necessary to protect one's self from an impending assault. State v. Williams, 337 Mo. 884, 87 S. W. 2d 175, 179. Yet it remains the law of necessity, real or apparent. State v. O'Leary, 44 S. W. 2d 50; State v. Traylor, 339 Mo. 943, 98 S. W. 2d 628; State v. Havens, 177 S. W. 2d 625. And the danger must be imminent or reasonably appear to be so. State v. Huett, 340 Mo. 934, 104 S. W. 2d 252, 261; State v. Eaton, 355 Mo. 164, 195 S. W. 2d 457, 459. See also Raymond's Instructions, Vol. 2, p. 613, et seq.

The testimony falls far short of a submissible issue of self-defense. At the time defendant assaulted Manor his back was toward him and Manor was apparently unaware of defendant's presence. There was no evidence of impending danger or the reasonable appearance thereof.

The most that can be said for the testimony on this issue is that defendant and Manor were and had been engaged in a continuing feud, and that when defendant struck he did so not in lawful self-defense, but in vengeance. The court did not err in refusing to instruct on self-defense. State v. Bennett, 87 S. W. 2d 159, 163-164.

While the jury was in its room considering its verdict, defendant, who was seated in the courtroom adjacent to the jury room, bolted and ran to the corridor, thence down the stairway and out the front door. Prison guards, detailed to guard him, gave chase and fired six or eight pistol shots in rapid succession before he was captured in the court house yard and returned to the courtroom. The shots could have been heard by the jury. A newspaper reporter made an affidavit that two members of the jury stated "the jurors had heard the shots and knew or had an idea of what was happening".

This commotion was the result of defendant's wilful and unlawful act and he cannot rightfully complain of any bad impression it may have left with the jury. But, in any event, there is no showing whatever that it had any effect on the punishment assessed. The assignment of error as to this episode is without merit.

During its deliberations the jury was returned into the courtroom and the following ensued.

"FOREMAN RINKLIN: From this part of your instruction —'If you find the defendant guilty of murder in the first degree, you will assess his punishment at death or imprisonment during his natural life', we don't understand what you mean by 'natural life'. Whether he will be imprisoned for the rest of his life or whether he would be subject to parole?

"THE COURT: (To Mr. Seacat) Shall I answer the question?

[592] "MR. SEACAT [Counsel for Defendant]: I think you had better.

"THE COURT: (To Counsel) I will give you an opportunity to amend what I say or ask me to amend it, if you think what I say is incorrect. (To Jury) Gentlemen of the Jury, the law provides that this man may be sentenced to death or imprisonment in the penitentiary during his natural life. Now, when a man is sentenced to the penitentiary for his natural life, it means he shall be imprisoned during his natural life—from now until the time he dies. However, there are other laws with which this Court and Jury has nothing to· do. We have a Penal Board, we have a State Board of Probation and Parole and, of course, we have a Governor who has the right to pardon or commute any sentence. The Governor can pardon anyone sent to the penitentiary for a term of natural life or he, upon the recommendation of the State Board of Probation and Parole, may parole a man at any time he sees fit. Ordinarily he doesn't do so unless he thinks the man deserves a parole, but if he thinks he does deserve a parole and if it is so recommended, then he is the final authority and has the sole discretion in determining whether or not the man shall be paroled. * * *

"What you are asking is whether or not, if you find this man guilty, and that is for you to say and I am not suggesting it, but if you do find the man guilty and give him life, whether or not there is any assurance he will remain in the penitentiary for his natural life. I have told you what the law is and I have told you what authority the Governor has and the authority of the State Board of Probation and Parole to recommend to the Governor and that will be a matter solely for his discretion uncontrolled and untrampled by this Court or by your findings.

"MR. SEACAT: I do not have any suggestion to make beyond what you have said, except to say that if the matter is handled as I understand, where a man is under two sentences, and the likelihood of his parole on this sentence if given another life sentence, they would not run concurrently and that would be taken into consideration by the Parole Board. While the

question of parole is a discretion on the part of the Governor, yet the Governor and the Parole Board are charged with the exercise of parole rights for the benefit of society and they take into consideration the whole record of a prisoner before granting a parole. * * . *

"Under the law this sentence will not run concurrently.

"THE COURT: It won't run concurrently. I can only say to the jury that the Governor has the right at any time from now on to parole anyone in the penitentiary who is serving any sentence, or even pardon anyone, and he can do that whenever he sees fit to do it. * * *

"If you find him guilty as charged, and you do not find him not guilty by reason of insanity, then you have no option except imposition of punishment by death or life imprisonment. Do counsel for either side desire at this time to make any suggestion about anything I have said to the jury?

"MR. SEACAT: I have nothing.

"MR. RILEY [Prosecuting Attorney]: No, sir."

The statements made by the court were invited by counsel for defendant and he participated therein and amplified them. They were not instructions on the law of the case such as are required to be in writing and no error is alleged in that respect. No objection was interposed at the time they were made or after the jury retired. It is not contended they misled the jury. Under these circumstances the court cannot be convicted of error.

Defendant had a fair trial before an able and distinguished judge. He was ably represented. The evidence amply supported the verdict. The jury, in its discretion, fixed his punishment at death. This is full compliance with law.

The judgment of the trial court is affirmed and sentence ordered executed December 15, 1950. All concur.