STATE of Missouri, Respondent,

v.

Reginald GRIER, Appellant.

No. WD 30916.

Missouri Court of Appeals,
Western District.

Nov. 3, 1980.

---

1. This includes principal and interest.

Lee M. Nation, Nation & Curley, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Darrell Panethiere, Philip M. Koppe, Asst. Attys. Gen., Kansas City, for respondent.

Before TURNAGE, P. J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

The defendant appeals from a conviction for murder in the second degree and a sentence of twenty years imprisonment. The defendant contends that the evidence shows that as a matter of law he acted in self–defense and so was entitled to a judgment of acquittal.

The site of the homicide was a sidewalk contiguous to the Sugar Shack and Mother's, two separate drink and dance establishments on Main Street. The victim, Van-Dyke, came upon a scene of physical conflict and bitter words between the defendant Grier, a young black man, and Rebecca Ruttan, a young white woman. He intervened and was killed. The two young persons knew each other and were together by prearrangement. The defendant had fetched her by automobile at her residence for an evening of dance and dinner. They then picked up Guilbeaux, another black man and, after a purchase of schnapps, arrived at the Sugar Shack. [The arrival was about 11:00 p. m., according to defendant Grier, and about 10:00 p. m., according to the inference of the Ruttan testimony. The date was Friday, December 16, 1977.] They occupied a table for three and drank and danced until about 1:00 a. m. the next morning. In the Sugar Shack they began to argue. The defendant accused her of a flirtation with another man there. [The inference from Guilbeaux evidence was that the contention was, rather, over the purchase of narcotic pills for her, who was then on methadone treatment for heroin addiction.] The verbal abuse resumed once outside the Sugar Shack and the two exchanged manual jousts. The defendant unlocked the door to the car [a new black Buick], parked south of the Sugar Shack along the west curb of Main, to retrieve a CB antenna placed there for safekeeping upon arrival at the discotheque. The car was located somewhere between the Sugar Shack and Mother's.

In the course of events, the defendant struck the female companion with the hand–accompanied by utterances of vulgarity–struck her with the CB antenna, or an extended wire hanger or chain [according to the account], so that she fell to the ground [or tripped, according to the defendant], and then as prostrate he kicked her about the abdomen as she wept and whimpered. The defendant finally subdued the young woman into the car. It was this scene VanDyke confronted [or, as witnesses for the *defense* described, the defendant

hovered over the woman, still on the ground and beat her with the object, when Van-Dyke appeared]. The deceased attempted a blow upon the defendant from behind and from that position locked his arms around the neck and upper anatomy of the defendant. A struggle ensued, VanDyke was wounded on the side of the head, in the chest area and around the legs and died from a knife puncture of the heart. The woman, the defendant driver and Guilbeaux in the rear seat, fled the scene in the Buick. In the course of investigation a white–handled knife–identified by some witnesses as the weapon wielded by the defendant upon VanDyke–was found in the Guilbeaux apartment where, by his testimony, the defendant had left it after the homicide.

■ The theory of the defense was that Guilbeaux, and not the defendant, owned and used the knife to kill VanDyke. The defendant testified that he used only the CB antenna, still in his hand, against Van-Dyke along the side of the head, but that the blow did not abate the struggle. As they continued embattled, the defendant saw a black hand [VanDyke was white] pull a knife from the body of VanDyke. As VanDyke slumped to the ground, the defendant saw that it was Guilbeaux who stabbed VanDyke. Two other witnesses corroborated that version of the events. The contention of defense–that one other than the defendant took the life of the victim–ostensibly contradicts the contention on appeal–that the defendant was justified as a matter of law to take the life of VanDyke. A criminal defendant, however, has no burden on the issue of self–defense. Once the evidence, from whatever source, raises self–defense, the burden rests on the State as an element of conviction to prove beyond a reasonable doubt that the homicide was not justified. *State v. Minnis,* 486 S.W.2d 280, 284[3–5] (Mo.1972). The question of lawful self–defense was submitted to the jury by MAI–CR 2.40 [first series] and found against the defendant by the conviction. The defendant argues by a motley of aphorisms, nevertheless, that his course of conduct was justified as a matter of law–that is, that no evidence negated

justification–and so was entitled to an acquittal.

■ The legal sufficiency of the evidence to submit justification by self–defense is for the court in the first instance. Only when *all* the evidence clearly and without dispute shows that the conduct of the accused was justified to take the life of another may a court acquit of the homicide without a tender of self–defense to the jury. *State v. Rash,* 359 Mo. 215, 221 S.W.2d 124, 125[2] (1949). The appeal poses, therefore, that all of the constituent elements of a *prima facie* self–defense were conclusively proved by the evidence. We determine, rather, that *all* of the proofs antecedent to a self–defense were disputed and contradicted in the evidence so that the issue was for the jury.

■ To support the plea of justification, there must be evidence that (1) the defendant was not the aggressor and did not provoke the use of force against himself, (2) there was a real or apparently real necessity to kill to save himself from an immediate danger of serious bodily harm or death, (3) the defendant had reasonable cause for such belief, and (4) the defendant did all within his power consistent with personal safety to avoid the danger and the necessity to take life, even to the point of retreat. *State v. Jackson,* 522 S.W.2d 317, 319[3] (Mo.App.1975); Richardson, *Self–Defense,* Missouri Bar Committee Comments on MAI–CR Instructions (1974).

■ The assertion of the right to judgment of acquittal rests on the thesis of "uncontroverted testimony that [the defendant Grier] was attacked and that such attack was in no way provoked by him." The law withholds recourse to self–defense to one who provokes a fray in which he then injures or kills his adversary. *State v. Spencer,* 307 S.W.2d 440, 443[2, 3] (Mo. 1957). Thus, it is only to protect against unlawful force–actual or apparent–that one may resort to self–defense. What one may do for himself, he may do for another. *State v. Totman,* 80 Mo.App. 125 (1899); *State v. Foley,* 12 Mo.App. 431, 435 (1882);

LaFave & Scott, Criminal Law (Hornbook Series, 1972) § 54. And, cognately, what one may do to defend himself, another may do for him—if that other believes danger to life or serious injury impends, or that such danger and necessity are reasonably apparent. A person who intervenes to defend another acts in the stead of the other, so that force by the intervenor is justified to the same extent force by the party defended would have been justified. *State v. McNail*, 182 S.W. 1081 (Mo.App.1916); *Bourster v. Fox*, 117 Mo.App. 711, 93 S.W. 318, 323 (1916); *State v. Reed*, 137 Mo. 125, 38 S.W. 574 (1897). The question at outset becomes, then, whether at the time VanDyke intervened to defend the woman, she would have been justified to apply the force against Grier that VanDyke applied on her behalf. If the evidence was doubtful whether the force administered by Grier upon the woman was unlawful—or that VanDyke believed it so—then the issue of whether the defendant provoked VanDyke was for the jury. The right to act in self—defense rests in necessity, real or apparent. *State v. Parker*, 403 S.W.2d 623, 627[3] (Mo. 1966). Thus, the cause and necessity for VanDyke to intervene are seen as those circumstances appeared to him.

■ The evidence of the events—except for the testimony of the principals, Grier, Ruttan and Guilbeaux—does not relate a consecutive narrative. The altercation between the defendant and the woman occurred on the sidewalk of Main Street between the Sugar Shack and the Buick automobile at the adjacent curb. VanDyke came upon the scene afoot on that sidewalk from the north. [One witness placed his movement onto the sidewalk, not from the north, but from Mother's the nearby drink and dance establishment.] The evidence shows, reasonably, these events open to the view of VanDyke between the emergence of defendant and the woman from the Sugar Shack and the VanDyke intervention: the man and the woman were in angry argument. They exchanged jostles, then Grier opened the car door, took out the CB antenna, and beat her about the upper body with that—or some other long metal object.

The defendant slapped the woman, she fell to the ground and, thus prostrate, he kicked her in the stomach and "all over [and] with pretty good licks" with the metal object as well [defense witness Welch]. The woman cried and whimpered, got up and was finally forced into the front seat of the car. As the defendant went around the car [to reinsert the CB antenna on the trunk (?)] Van-Dyke came up to Grier, struck at him and pinned the upper arms down within the vise of his own grasp. This composite of events from *all* the witnesses, the defendant himself included, presented *at most* a jury issue as to whether Grier was the aggressor as between himself and the woman—and hence as between Grier and VanDyke and so provoked the assault upon the defendant by the intervenor in defense of the woman. That issue was found beyond a reasonable doubt in favor of the prosecution under the submission of MAI–CR 2.40 which then governed self—defense. The contention of provocation as a matter of law means that the circumstances and appearances were such, conclusively, that VanDyke could not have come to a reasonable belief that the assault by Grier upon the woman was unlawful—and that, in any event, VanDyke asserted a force against Grier disproportionate to the necessity of the circumstances. *Brouster v. Fox*, supra, 93 S.W. l.c. 323. The evidence shows, rather, circumstance and necessity as would justify the woman to clench her arms around Grier and take the other action VanDyke took to prevent further injury to herself. The intervention by VanDyke in her stead against Grier, therefore, was justified.

■ The right to defend self or to intervene to defend another does not imply the right to attack. *Brouster v. Fox*, 93 S.W. l.c. 323. An actor who justifiably intervenes to defend another may thereafter become aggressor and so restore occasion to the other for self—defense. [LaFave & Scott, Criminal Law (Hornbook Series 1972)]:

§ 54: As with self—defense, so too with defense of another, one is not justified

in using force to protect the other unless he reasonably believes that the other is in immediate danger of unlawful bodily harm and that force is necessary to prevent that harm; and even when he entertains these reasonable beliefs, *he may not use more force than he reasonably believes necessary to relieve the risk of harm.* [emphasis added]

§ 53: It is generally said that one who is the aggressor in an encounter with another–i. e., one who brings about the difficulty with the other–may not avail himself of the defense of self–defense. Ordinarily, this is certainly a correct statement, since the aggressor's victim, defending himself against the aggressor, is using lawful, not unlawful, force; and the force defended against must be unlawful force, for self–defense. Nevertheless . . . [a] nondeadly aggressor . . . *who is met with deadly force in defense may justifiably defend himself against the deadly attack.* This is so because the aggressor's victim, by using deadly force against nondeadly aggression, uses unlawful force. [emphasis added]

See, also, Richardson, *Self–Defense*, Missouri Bar Committee Comments on MAI–CR Instructions 25 (1974); 6A C.J.S. Assault & Battery § 22.

The defendant contends that uncontroverted evidence of audible gunshots and of an exclamation: "He's got a knife" gave him reasonable cause to believe that he was in immediate danger of death or serious bodily harm from VanDyke and so resort to a knife was a lawful response to apprehension of danger of deadly force.[1] The narratives of the witnesses on this evidence, contrary to contention, are not without dispute. The evidence by prosecution witnesses Guilbeaux, Summerskill and Wood was that Grier stabbed VanDyke several times. Guilbeaux, companion of the evening with defendant and the woman, saw the episode from the back seat of the car where he entered after the three left the Sugar Shack. Summerskill and Wood were patrons at Mother's nearby to the Sugar Shack and had seen the defendant and the woman jostle each other before they entered the tavern. They emerged from Mother's within minutes to see the defendant put the woman into the car at the curb as she cried and he vituperated profanity. At that point, they saw VanDyke come up the sidewalk from the north and wrestle the defendant and then saw the defendant stab VanDyke repeatedly with a knife. The witnesses saw Guilbeaux then in the rear of the car. The witnesses Harbin, Summerskill, and Wood heard defendant Grier shout to Guilbeaux: "Give me a gun, give me a gun!" Then three reports, they thought was gunfire, followed. Guilbeaux testified that Grier shouted to him to get the gun [that they and the woman knew was in the glove compartment] but that he could not gain access to the weapon because the woman was in the way. There was no doubt that it was defendant Grier, *himself*, who shouted for the gun in the car. That was established by *all* the witnesses, for the prosecution and defense alike–the defendant included. The sound of gunshots–heard by some but not by others–therefore, could have been no cause for apprehension that VanDyke resorted to the deadly force of a pistol. The defendant knew the weapon was at the access of his own social group, and not VanDyke.

In the course of the grapple, Waters [witness for the defense] shouted: "He's got a knife." On appeal, the defendant says he understood that to mean that VanDyke was armed and that such an apprehension was sufficient to cause one in his [Grier's] position to oppose the deadly force with defensive deadly force. The defendant does not contend that *he* was led to a reasonable belief that deadly danger from a knife was about to befall *him* so that he was justified to respond by a condign force. Rather, the theory of defense [supported by two other witnesses] was that Guilbeaux, in fact, stabbed VanDyke as he came to the aid of

---

1. The defendant makes only a hypothetical argument on appeal as at the trial Grier has maintained that Guilbeaux, and not he, stabbed and killed VanDyke.

his embattled companion. That was the very testimony of defendant Grier as well. The sense of the Grier narrative was that he had already seen Guilbeaux stab Van-Dyke when he heard the shout: "He's got a knife." Thus, in any event, the wounds were inflicted on VanDyke before any cause for apprehension was apparent to Grier [as the hypothetical defender]. That contention of defense was contradicted by prosecution evidence that Guilbeaux never left the car but that Grier administered the knife stabs.

The contention that the evidence demonstrated self–defense conclusively, so as to declare acquittal for Grier, therefore, has no basis. The obligation of the prosecution to prove beyond a reasonable doubt the want of justification arises upon a prima facie showing—from any substantial evidence—whatever the theory of defense. Richardson, *Self–Defense*, Missouri Bar Committee Comments on MAI–CR Instructions 49 et seq. (1974); *State v. Minnis*, supra, 486 S.W.2d l.c. 284[3–5]. There was scant evidence, if at all, to make even a submissible case of self–defense for Grier. If we assume, nevertheless, that the remark about a knife could have induced Grier to a reasonable belief he was about to suffer great bodily harm so that resort to a weapon was a force not disproportionate to the threatened harm [*State v. McGee*, 361 Mo.

309, 234 S.W.2d 587, 591[6] (banc 1950)], that evidence was for the jury to assess along with the abundant evidence to the contrary.[2]

The second point on appeal presents merely a variant of the contention that justification was proved as a matter of law: "absent the disproof of justification, stabbing alone was insufficient to establish guilt." We have concluded that the evidence made out, *at best*, a submission of self–defense and that the jury verdict concludes that determination of fact against the defendant. There was abundant evidence that Grier stabbed VanDyke with intention to inflict serious bodily harm and without provocation of justification. Those elements of proof of second degree murder [and want of self-defense] were submitted by MAI–CR 15.15 and found for conviction.

■ The last point asserts that inquiry by the prosecutor of the venire during voir dire whether the defendant "Reginald Grier, also known as Edward E. Fields" was known to them tainted the defendant as a criminal and so was inherently prejudicial. The court refused the defense motion for mistrial. The contention does not reach us simply because not preserved for appeal in the motion for new trial. We note, nevertheless, that the defendant took the stand and in response to questions from his attor-

---

**2.** The evidence showed that VanDyke was not armed. Guilbeaux testified the death weapon belonged to Grier and was left at the Guilbeaux apartment after the affray. Grier denied ownership. A person, of course, may defend against a danger real or apparent so that the use of deadly force remains justifiable even if the appearances [that VanDyke was armed] turned out to be false, so long as the perception of deadly danger rested on a reasonable belief. *State v. Traylor*, 339 Mo. 943, 98 S.W.2d 628, 631[2] (1936). The reasonable cause and necessity to kill in defense are to be viewed as the circumstances appeared to the defendant. *State v. Roark*, 428 S.W.2d 508, 512[2, 3] (Mo. 1968). The reasonableness of the belief, however, is an *objective* test. *State v. Cook*, 428 S.W.2d 728, 731 (Mo.1968). Thus, that Van-Dyke was not armed does not preclude the self–defense issue, but it bears on the reasonable belief of the defendant to act as he did and renders justification a jury issue—and contradicts the contention that the evidence made out

self–defense as a matter of law. In addition to the other evidence—the call by defendant for a pistol at the outset of the tussle—even before the awareness of a knife and the evidence that he alone wielded a knife—the conduct of the defendant *after* the fray bears on his state of mind—that is, whether to provoke or defend. The defendant at the wheel of the car, and Guilbeaux and the woman sped away from the scene of the homicide without attempt to aid the victim, or enlist the bystanders, or the police. The testimony of the woman, as a *defense* witness, was that as they sped away the defendant remarked: "It's all your fault. I could have thrown the little guy through the window. This dilly bitch is going to narc on me. Where's my gun?" To which the woman entreated "Please don't kill me because I never narced on anybody." This episode of flight, also, raises an issue inconsistent with a contention of self–defense. *State v. Davis*, 572 S.W.2d 243, 246[1] (Mo.App.1978).

ney acknowledged a prior conviction under the name of Fields.

The judgment is affirmed.

All concur.