WILLIAM H. STONE, Plaintiff-Appellant, v. FARMINGTON AVIATION CORPORATION, a Corporation, Defendant-Respondent, No. 41763— 232 S. W. (2d) 495.

Division One, July 10, 1950.

Motion to Modify Judgment and Opinion Overruled, September 11, 1950.

*Robert A. McIlrath* and *Tyree C. Derrick* for appellant; *Karl E. Holderle, Jr.,* of counsel.

*Dearing & Matthes* and *Will B. Dearing* for respondent.

CONKLING, P. J.—William H. Stone, plaintiff below and appellant here (hereinafter called plaintiff), sued Farmington Aviation Corporation, defendant below and also appellant here (hereinafter called defendant), for $15,000 damages for personal injuries. The jury's verdict for plaintiff awarded damages of $1,000.00. Plaintiff's motion for new trial contended his verdict was inadequate. The

trial court overruled that motion and plaintiff appealed. In this court, contending his verdict was inadequate, plaintiff asks the remand of the case for retrial upon the sole issue of the amount of damages. Defendant also filed an after trial motion asking the court to enter a judgment for defendant in accordance with its motion for a directed verdict offered at the close of all the evidence. The trial court also overruled defendant's motion. Defendant also appealed and here contends.the record evidence is insufficient to support any verdict for plaintiff. The two appeals have been consolidated.

■ The injuries sued for resulted from the crash of an airplane rented by plaintiff from defendant and which plaintiff was then operating upon his honeymoon to the Lake of the Ozarks. The crash occurred when the plane struck electric power line wires. The plane crashed on the Grand Glaize airfield near Camdenton, Missouri. We first consider defendant's contention that the evidence before us here is not sufficient to support a verdict for plaintiff in any amount whatever. This requires our consideration of the facts in the light most favorable to plaintiff.

The petition alleged that plaintiff rented the Piper Cub Model J-5A plane on a flight hour basis; that defendant warranted the plane "was suitable and in proper condition for use"; that the belt on the rear seat "broke and that as a direct and proximate result thereof", his wife was thrown against plaintiff's seat, "and thus and thereby injured him;" that the belt attached to the rear seat (in which his wife was riding) "was old and rotten and defective and not suitable for the purpose for which it was intended"; that as he was attempting to land at the Grand Glaize airport, "said airplane was caught in a down draft causing the wheels or landing gear to strike certain electric power and light wires" and caused the plane to crash; that when the plane struck the ground the belt around his wife (seated immediately behind him) broke; that she was thrown forward against him thereby causing his injuries. The petition specifically alleged, "that the breaking of the rotten and defective belt was the direct and proximate cause of his injuries."

Plaintiff submitted his case in his instruction 1, and predicated his verdict upon the jury finding, that the "safety strap provided for the back seat of said airplane in which the wife of plaintiff was riding was rotten and unsafe, * * * that * * * the safety strap * * * broke", that "the breaking was due to its rotten and defective condition", that his wife was thrown against him causing his injuries, and that the "breaking of said belt was the proximate cause of plaintiff's injury or (if the break) concurred with an Act of God (the down draft) in causing said injuries."

The evidence showed that plaintiff was a licensed pilot, and, before the day of his injury, had flown the plane which he was flying when he crashed; that about a week before the crash he arranged to rent

the plane in question; that when plaintiff and his wife went to defendant's airfield near Farmington, Missouri, on August 31, 1947, to get the plane plaintiff was advised by defendant that the plane "was ready for the trip." It had been given a "line check" inspection and general servicing. Gas and oil were checked. There was no oil leak. After every 25 hours of operation the plane had been inspected by a licensed mechanic before the oil was changed and all minor repairs were made. Plaintiff testified: "I looked the plane over myself. Outwardly it appeared good, and checked all control mechanisms * * * and checked all instruments before taking off. * * * . I looked the plane over to see that it had a sufficient gas supply and ready to fly. * * * I checked the instruments and the air safety belts to see if they was secure and tight, and we took off," etc. Plaintiff was piloting the plane, and stopped for an hour at the Rolla airport. After leaving Rolla, and upon approaching the Grand Glaize airfield plaintiff first made a low approach to survey the field, and then made "the regular traffic pattern and standard approach to the field for landing." The wind had a velocity of ten to fifteen miles per hour and "was lined up perfectly with the runway." He saw some telephone wires and cleared them. He did not see the electric power wires which the plane struck while he was attempting the landing. The field was about 2,000 feet long. Plaintiff testified the air "was a little bit rough and turbulent but not enough to make it unpleasant * * * nothing abnormal." Due to the nature of its construction plaintiff said he did not have good visibility ahead over the nose of the plane but he testified he could see "if you look to one side or the other." Oil spray "foamed up", and limited his visibility on his left side. In landing the plane hit the power line wires and in a split second crashed at about 50 miles an hour.

The power line wires were about 35 feet off the ground and "across the end of the landing strip." One pole for these wires "is directly in the path of the runway." One wheel of the plane hit a power wire, broke it, and the plane nosed down and "hit the ground at about a 45 degree angle." The impact dug up the earthen runway. The cowling under the engine was imbedded in the runway. The engine and fire wall were pushed back toward the pilot's seat. After the plane crashed one power wire was in the plane wreckage and had to be cut free to get Mrs. Stone out. After the crash the safety belt across in front of plaintiff's wife was found to be broken. The belt fastened across in front of plaintiff was not broken. Plaintiff's seat in the plane was struck from behind. His wife was partly against the corner of plaintiff's seat; she had been thrown through the door of the plane and her body was "hanging partly out of the plane on the other side." She, too, sustained personal injuries in the crash. Plaintiff's foot was driven through the bottom of the plane. He was removed from the plane with great difficulty: "He

was jammed up almost to the instrument board, practically against it." The wrecked plane was sold for junk. Plaintiff's wife testified that she did not "remember anything about the landing at all." Plaintiff testified that when a plane hits the ground "on a nose dive" that much force is generated and it is the tendency of all objects in the plane to "go forward."

Prior to the crash the safety belt was fastened across in front of plaintiff's wife. After the crash it was found to be broken "about halfway between the buckle and the place where it fastened to the metal frame work." The belt was woven of "three-sixteenths inch material * * * very heavy cloth material." The break showed no raggedness, "just a straight piece of belt very clean cut. * * * The tear was very smooth, very plain." When a new belt is strained to the breaking point it tears "in a very ragged manner and leaves long shreds * * * doesn't tear at one place, tears haphazardly and ragged." Mr. Thompson, manager of the Grand Glaize airport, was standing on the field and saw the plane crash. He also examined the belt in question and testified that in a new belt "the fibers in it seemed to be long, longer than when it is broken in two. There is long ragged fibers showing where the belt is broken." He testified that "this belt had broken, and it was a very near plan (plain) break, with shreds, I would say, three-eights of an inch long, or longer." There was no testimony that the belt was rotten or defective, or unsafe, or that it was "not suitable for the purpose for which it was intended." From the testimony as to the appearance of the belt after the crash, the most that might be inferred is that it was not a *new* belt.

We do not consider the last stated inference to be alone sufficient. While the petition alleged that (among other things) the belt was old, the only inference that could possibly be drawn from the evidence ▮▮▮▮ is that the belt was not *new*. It may not be further inferred (from the above inference) that the belt was also "rotten and defective and not suitable for the purpose for which it was intended." The petition alleges the belt was "old *and* rotten *and* defective *and* not suitable for which it was intended." If we infer the belt was not new, from that inference alone it may not be further inferred that because thereof the belt was caused to break and result in plaintiff's injury. Unless we could infer the belt was also "defective and not suitable" and unless we could also infer a causal connection between such condition of the belt and plaintiff's injuries, liability would not follow here in any event. But that the belt was "defective and not suitable" there is neither proof nor allowable inference. The inference that the belt was not new must be drawn from plaintiff's testimony that he had seen such belts "put on hydraulic check and stretched until they would break." Nothing here appears as to the amount of pressure used in those "hydraulic check" tests, or as to whether it may

or may not have been more than the pressure to which the belt was subjected in this crash. The inference that the belt was *not new* must be drawn from somewhat unsatisfactory evidence.

But defendant suggests an even more serious deficiency in plaintiff's proof. It is conceded that facts and inferences necessary to plaintiff's recovery may be established by circumstantial evidence, but defendant contends that, under the pleadings and evidence now before us, any verdict at all for plaintiff will be based only on conjecture and speculation; and that it is not legally inferable that the breaking of the belt was either causal or contributory. . Upon this feature of the case the evidence showed only that the safety belt around plaintiff's wife was found broken after the crash, that plaintiff's seat was struck from behind and, after the crash, the seat was found to be bent some forward. Are those facts sufficient to show that the breaking of the safety belt caused or contributed to plaintiff's injuries? The determination of that question must be considered against the background of the other facts as to the crash. And there is no evidence here as to (1) the distance between the two seats, (2) the elasticity or normal give, if any, of the safety belt, (3) when the belt broke, (4) whether it was possible for a crash of this severity at an angle of 45° to throw a passenger against the back of the front seat even if the belt had not broken, or (5) the cause of the belt breaking. Other links in the chain of proximate causation between the claimed cause and plaintiff's injuries are obscured in doubt.

We recognize that this crash occurred within the fraction of a second and that the details of such an occurrence are always difficult or substantially impossible to relate and coordinate as to sequence. It must be borne in mind, however, that it was plaintiff who, unfortunately, operated the plane into the power line and crashed it. He it is who seeks recovery upon this specific negligence. And before recovery can be allowed plaintiff must prove his case as laid and his proof must take his case out of the realm of conjecture.

Who can say from these facts (there is no proof) when or why the belt broke? It appears only that after the crash it was found to be broken. Who can say from these facts (there is no proof) that except for the breaking of the belt plaintiff would not have been injured? Under the instant facts, such a conclusion is so unlikely and improbable that it must be instantly rejected. Who can say from these facts (there is no proof) that, assuming the breaking of the belt permitted Mrs. Stone to be thrown against the back of the plaintiff's seat, that such fact contributed in any degree to the injuries plaintiff received in this crash, or that his injuries were any increased thereby? Only with guess and speculation could any one hazard an answer to these questions. Proximate causation here is left wholly within the field of conjecture and speculation. Many things must be

assumed, and inference must here be piled upon inference to hold that plaintiff made a submissible case. We have no proof and no basis for allowable inference as to the negligence as alleged in the petition. Upon this record we cannot escape the ruling that no submissible case was made upon the theory presented. It is axiomatic that judgments based on speculation and conjecture cannot stand. For the above reasons the judgment appealed from cannot stand.

From the above it follows that the questions. raised by plaintiff as to the inadequacy of his verdict, and the remand of the cause for retrial upon the sole issue of the amount of damages pass out of the case and we need not consider them. We note plaintiff's further contentions, made in his brief, that the trial court denied his offer of certain material evidence and erred in denying him permission to amend his petition to conform to the proof he had adduced. Those contentions are not here for ruling. Any such errors claimed by a party on his own appeal from a judgment in his favor were cured by the jury's verdict in his favor. Cochran v. Wilson, 287 Mo. 210, 229 S. W. 1050.

 Upon the question of a general remand of this case, we observe that with respect to the conditions obtaining, when he was preparing to land the plane, plaintiff testified, without objection, that, ''On my left side, as I came around that final approach to the field, oil spray from the engine foamed up and left a limited visibility, and at the time I was making the approach the last visibility was wiped out, and as I looked to the other side it was too late· to do anything. * * * I started my approach at sixty miles an hour, and at the time my windshield became sprayed with oil. The plane began to feel slow. The speed indicator was registered on sixty. The field push control service indicated it was not flying sixty miles per hour but it was obviously at a slower speed, I should say would be fifty miles per hour or under fifty miles per hour.* * * And as I was still trying to look out of the plane I tapped on the instrument panel * * * to see if possibly it were the speed indicator was defective or if the meter would jar loose or was stuck or what would happen. As I glanced to it again the meter had dropped to a little below fifty miles per hour, and I was too close to regain speed, and the plane wouldn't speed fast enough to gain speed, and my poor visibility was added to that.''

When that testimony was sought to be developed defendant's objection that, ''there is no allegation in the petition alleging defendant was responsible for any oil being sprayed. It constitutes an entire departure from what they plead in the petition,'' was sustained. The trial court ruled that it was ''not plead as a ground of negligence.'' Defendant's counsel stated that defendant was ''not here to meet that proof.'' Plaintiff made certain offers of proof with respect to the

oil spray and the speed indicator which the trial court, under the pleadings, refused to permit. Plaintiff's counsel thereafter moved for leave to amend his petition to conform to the proof so as to include the above matters, but did not offer to take a general continuance of the trial of the case to give defendant an opportunity to prepare to meet that new evidence. Defendant's counsel objected to any amendment, stating, ''We are not prepared to meet any theory such as counsel offers at this late date'', etc. The trial court denied the motion for leave to amend the petition. And we do not rule that, under the circumstances then before it, the trial court erred or abused its discretion in so ruling. Such question is not here for ruling.

We refer to the above as tending to establish the possibility that plaintiff may not have fully developed or exhausted his case, and as bearing on whether we should remand. We reserve our views as to the merits of any questions not presently before us.

Inasmuch as plaintiff may desire to amend his petition, the judgment appealed from will be reversed and remanded. It is so ordered. All concur.