Glen L. McCORMACK, Plaintiff-Appellant,

v.

Wayne L. McNAMEE and Donald Speidel,
Defendants-Respondents.

No. 44155.

Supreme Court of Missouri.

Division No. 1.

Jan. 10, 1955.

Thurman, Nixon & Blackwell, Hillsboro, for appellant.

Moser, Marsalek, Carpenter, Cleary & Carter, Lee M. Carter, St. Louis, and H. L. C. Weier, Hillsboro, for respondent Wayne L. McNamee.

Dearing & Matthes, Will B. Dearing, Hillsboro, for respondent Donald Speidel.

LOZIER, Commissioner.

Appellant McCormack (herein called plaintiff), a passenger in a car driven by defendant Speidel, sued Speidel and defendant McNamee for $100,000 damages for personal injuries allegedly sustained on November 12, 1951, in a collision between Speidel's and McNamee's automobiles as a result of the alleged negligence of the two defendants. Speidel cross-claimed against McNamee and McNamee cross-claimed against Speidel for $1,600 and $750 respectively (damages to their respective automobiles). McNamee had verdict and judgment on plaintiff's claim and against Speidel for $600 on his cross-claim. Plaintiff had verdict and judgment against Speidel for $5,000. Plaintiff appealed.

Plaintiff contends that his new trial motion should have been sustained because the statutes relating to the impaneling of the jury were violated (and that his counsel had no knowledge thereof until after the trial) and because the verdict was so inadequate as to conclusively establish bias and prejudice on the part of the jury. He also contends that the trial court should have declared a mistrial under the circumstances hereinafter stated.

Plaintiff's first point is that the trial court erred in overruling his new trial motion "wherein plaintiff set forth gross violations of the Missouri statutes regulating the impaneling of jurors who tried said cause, and lack of knowledge on the part of plaintiff and his counsel of such procedure and statutory violations until after the trial, the motion being supported by affidavits of four members of the five-member Board of Jury Commissioners as well as verification by plaintiff." In his "Argument," plaintiff argues alleged violations of Sections 494.230, 494.240 and 494.250 (all section references are to RSMo 1949, V. A.M.S.). He concludes: "Because of the violations of the Missouri Statutes * * * as aforesaid, he was denied a decision in the cause based on the honest deliberations of twelve qualified men; and his motion for new trial based on the ground of such violations should have been sustained."

Plaintiff had a verdict and judgment. In the absence of an apparent or demonstrated connection between the size of the verdict and the irregularities in the selection of the jury, and in the absence of the contention that the alleged irregularities rendered the verdict and judgment void ab initio, plaintiff is in no position to urge such irregularities here.

Nevertheless: The case was tried during the September 1953 Term of the Circuit Court of Jefferson County. The transcript shows the names of 24 petit jurors (8, 5, 4, 3, 2, 1 and 1 from the respective seven townships of the county) and of 24 alternates (similarly apportioned among the townships).

Under Section 494.230, the members of the board of jury commissioners of Jefferson County are the circuit judge, the circuit clerk and the 3 judges of the county court. Under Section 494.240, it is the board's duty, not less than thirty days prior to the commencement of the circuit court

term, to select names of not less than four hundred qualified persons as prospective petit jurors and alternate petit jurors, selecting "as near as practicable, the same number from each township in the county according to the relative population"; and, after determining the number of such jurors to be selected from each township, to place the names of the persons from each township on slips of paper in a box and thoroughly mix them. Section 494.250 provides, inter alia, that the circuit clerk, "so situated as to be unable to see the names on such slips, shall, publicly, in the presence of said board of jury commissioners, proceed to draw out names separately and singly from" each township until he has drawn the number of names required from that township to serve as such jurors until the list of names of the 24 jurors and 24 alternates is obtained.

The verdicts were rendered, and the ensuing judgments were entered, on October 30, 1953. Plaintiff's new trial motion was filed on November 9, 1953. In that motion, plaintiff alleged, inter alia, noncompliance with the above-summarized provisions of Sections 494.230, 494.240 and 494.250 in the selection of the panel and that "neither plaintiff nor his counsel had any knowledge of such procedure and statutory violations until after the trial of this case had been completed; and that, therefore, plaintiff had no opportunity previous to the filing of his motion for new trial to object to or challenge the panel." In his motion, plaintiff requested 15 days within which to file affidavits in support thereof. (Plaintiff's attorney also orally made a similar request when he filed the motion.) The request was granted.

On November 23, 1953, plaintiff filed the affidavits of each of the 3 judges of the county court "that he did not meet with the other members of the board of jury commissioners at any time prior to the September Term, 1953, of the Circuit Court of Jefferson County, Missouri, for the purpose of selecting names of persons to serve upon the petit jury panel for that term; that he did not participate in any manner in the selection of names of persons to serve upon said panel at said term; and that he knows nothing about the method used for the selection of said panel at said term"; and the affidavit of the circuit clerk that he had been appointed to that office on August 8, 1953, and "that at no time subsequent to the aforementioned date did he meet with the board of jury commissioners * * * for the purpose of selecting names of persons to serve upon the petit jury panel for the September term of the circuit court * * * and that he did not participate in any manner in the selection of names of persons to serve upon the said panel at said term and that he knows nothing about the method used for the selection of said panel at said term."

On December 2, 1953, the parties appearing by their respective counsel, plaintiff's new trial motion was "taken up, heard and considered * * * and overruled." Insofar as the transcript shows, the only evidence offered by plaintiff at the hearing upon the motion was the affidavits of the judges of the county court and the circuit clerk.

In our view, the trial court properly ruled this particular issue for several reasons. Section 494.250 contains a provision for the selection of the panel in the event it is not selected by the board of jury commissioners in accordance with the above-summarized provisions of Sections 494.240 and 494.250. Such provision is: "provided, that in all cases where the board * * * shall fail to select such jurors and alternates * * * the sheriff of the county shall summon such petit jurors from the several townships in the county, according to their respective populations, as nearly as may be, not less than 10 days before the first day of the term of the court for which such jurors are summoned * * *."

■■ Absent evidence to the contrary, it must be assumed (and the trial court was entitled to assume) that the sheriff selected the panel in accordance with that statutory provision. "On appeal, the presumption always is that the decision of the lower court was correct, and the burden is upon

appellants to affirmatively show error as a condition precedent to reversal." State to the Use of Consolidated School Dist. No. 42 of Scott County v. Powell, 359 Mo. 231, 221 S.W.2d 508, 511[7]. "The appellate court will indulge any proper presumption in favor of the proceedings summoning and impaneling a jury" and "in the absence of a showing to the contrary, that the jury was legally and properly constituted of qualified persons." 3 Am. Jur., Appeal and Error, Sec. 936, p. 502. And see State v. Woodard, 309 Mo. 19, 273 S.W. 1047, 1049[3], involving selection of the panel by the sheriff under what is now Section 494.250. Instant plaintiff-appellant has failed to sustain his burden of proof as the record does not affirmatively show that the sheriff did not select the panel in accordance with the pertinent provision of Section 494.250.

At the time plaintiff-appellant filed his reply brief in this court, September 14, 1954, he filed the affidavit (executed September 7, 1954, after respondents Speidel and McNamee had filed their briefs here) of the sheriff of Jefferson County that "he has read and examined the list of regular and alternate petit jurors for the September term 1953, as set forth on pp. 197–198 of" the transcript and "that although he did summons as jurors the persons whose names appear on the aforementioned list, he did not select, nor participate in the selection of, the persons whose names appear on the aforementioned list as regular and alternate petit jurors for the September term, 1953 * * *; that he does not know the method by which the persons whose names appear on the aforementioned list were selected; and that he received the aforesaid list of regular and alternate jurors * * * from the office of the circuit clerk * * *."

Stating that he "fully realizes that he is defectively raising and preserving this point in his argument," plaintiff argues that the error "affected his substantial rights * * * and that manifest injustice will be done" unless this court considers the sheriff's affidavit under Supreme Court Rule 3.27, 42 V.A.M.S. That rule is:

"Plain errors affecting substantial rights may be considered on motion for new trial or on appeal, in the discretion of the court, though not raised in the trial court or preserved for review, or defectively raised or preserved, when the court deems that manifest injustice or miscarriage of justice has resulted therefrom." However, there is no situation here which would indicate that a "manifest injustice or miscarriage of justice has resulted" from any alleged error of the trial court.

 Generally, challenges to a petit jury panel based upon alleged irregularities in its selection are waived by failure to file a motion to quash the panel. See State v. McGoldrick, Mo., 236 S.W.2d 306, wherein it was held that the trial court should have sustained the defendant-appellant's motion to quash because of substantial noncompliance by the board of jury commissioners with what are now instantly involved Sections 494.230, 494.-240 and 494.250. See also Massman v. Kansas City Public Service Co., Mo., 119 S.W.2d 833, 837[5, 6]; Doran v. Ross, 240 Mo.App. 823, 221 S.W.2d 756, 757[1]; Sullivan v. Kansas City Public Service Co., Mo.App., 231 S.W.2d 822, 827[11, 12]. In certain instances, however, the issue may be raised for the first time in the new trial motion. State v. Rouner, 333 Mo. 1236, 64 S.W.2d 916, 922[5], 92 A.L.R. 1099. See authorities, supra, and State v. Thursby, Mo., 245 S.W.2d 859, 865[18, 20]. In the Rouner case, the holding was, as stated in 31 Am.Jur., Jury, Sec. 80, p. 615: "Generally, however, a party does not, by failure to object until after verdict, waive prejudicial errors in the selection of jurors where the circumstances do not become known to him until after the verdict and where there is no fault on his part with respect to his not obtaining such knowledge previously." In the Rouner case, this court reviewed prior decisions wherein it was held that failure to raise the question by motion to quash either was or was not a waiver of the right to object to irregularities in the selection of the panel under what are now Sections 494.240 and 494.250—including circumstances in-

volving the time the appellant or his attorney first learned of the irregularities, whether they could and should have obtained knowledge thereof previously and evidence offered and considered by the trial court at the hearing on the new trial motion.

Application of the principle of the Rouner case requires the ruling that, for other reasons, the trial court did not err in overruling plaintiff's allegations of error as to the panel. At the hearing on his new trial motion, plaintiff offered no evidence tending to prove the allegations of the motion that "neither he nor his counsel had any knowledge of such procedure" until after the trial and that he had no opportunity, prior to the time he filed the motion, "to object to or challenge the panel." (While the motion was sworn to by plaintiff, the allegations of the motion do not prove themselves. Block v. Rackers, Mo., 256 S.W.2d 760, 764[5–8].) In other words, plaintiff failed to show that there was "no fault on his part with respect to his not obtaining such knowledge previously." Furthermore, plaintiff has not pointed out wherein he was prejudiced by any irregularities in the selection of the panel. Indeed, the record affirmatively shows that the errors (if any there were) did not prejudice plaintiff as he had a unanimous verdict for $5,000 against Speidel.

Plaintiff's "second contention is that the trial court erred in failing to sustain plaintiff's motion for a new trial on the ground that the amount of the verdict returned by the jury in favor of the plaintiff was so inadequate as to conclusively establish bias and prejudice on the part of said jury." He argues that "the testimony in the cause with reference to plaintiff's injuries and disability was positive and overwhelming; * * * that a consideration of the testimony of the four doctors (hereinafter mentioned), based upon their qualifications, their contacts and length of contact with plaintiff, their opportunities to observe plaintiff, the various examinations and tests which were given plaintiff by them, leads to the conclusion that the tesimony of the first three doctors (plaintiff's witnesses) establishes beyond question the seriousness of plaintiff's injuries and his present and future disability. * * * This verdict reached by the jury, when viewed in the light of the testimony of the doctors, cannot be justified on any basis except misconduct, bias and prejudice on the part of said jury, or a wilful disregard of the weight of the evidence on the part of the jury."

"The trial court, in overruling plaintiff's motion for new trial on the ground of inadequacy of verdict, weighed the evidence and determined that a verdict in the sum of $750 was not against the weight of the evidence. * * * We do not weigh the evidence in this action. We determine only whether the trial court abused its discretion in overruling plaintiff's motion for new trial on the ground of inadequacy of verdict. * * * In making this determination, we examine the record to ascertain whether there is substantial evidence to support the action of the trial court. * * * We do not, however, review the evidence pertaining to injuries from a standpoint favorable to plaintiff but, on the contrary, consider the evidence from the standpoint favorable to the verdict and to the action of the trial court in overruling plaintiff's motion for new trial on the ground of inadequacy." Roush v. Alkire Truck Lines, Inc., Mo., 245 S.W.2d 8, 10[1, 2, 3, 4]. And see Sanders v. Illinois Central Railroad Co., Mo., 270 S.W.2d 731, 737[4, 5], [6, 7], 738[8–10].

Plaintiff was 34 years old at the time of the accident, 36 at trial time. He was a factory worker earning $1.86½ an hour, forty hours a week and overtime. In the accident, he was not rendered unconscious, his head was bruised on both sides, the left side of his head was bleeding, his right thumb was bruised and his back was bruised in two places. He was taken to St. Louis County Hospital and, later that evening, to St. Mary's Hospital. He left St. Mary's Hospital on November 17, 1951, and returned to his brother's home in Festus. He was "nervous," his back was

hurting him and his head was "still sore." He walked into Festus for his meals and "just spent my time the best I could * * * visiting different places" in Festus. Upon the written certification of Dr. R. H. Donnell, his family physician, that he was able to resume work, he worked about 3 weeks at his old job in January 1952, but had to quit, he said, because he was "unable to do the work," and had not worked since. (Dr. Donnell's bill was $176. There was no evidence that plaintiff incurred any other medical or hospital expense.) Between March 18, and September 3, 1952, he was in the Veterans Hospital at Jefferson Barracks. "Something happened to my right foot," and he had trouble with his jaw. At trial time: "I am unable to function my mouth properly. My nervous system has been disrupted. * * * I have pains in my back and my leg and right foot. My right foot aches to the extent it causes me to limp."

After examining the evidence from a standpoint favorable to sustention of the trial court's action, we have concluded that there was substantial evidence to support the order overruling plaintiff's new trial motion as to the inadequacy of the verdict. Of course, if the jury had believed all of plaintiff's medical evidence as to his injuries and disabilities, there was evidence to support a verdict for a larger amount than $5,000. But the trial court could reasonably have believed the testimony of defendant's medical witness as to plaintiff's injuries and resulting disabilities. Such testimony constituted substantial evidence to support the trial court's action.

Dr. Oscar P. Hampton, Jr. (defendant's witness), orthopedic physician and surgeon, examined plaintiff on December 19, 1952. Plaintiff walked with a slight limp and was wearing a belt and a foot brace. He complained of headaches, inability to open his jaws, and pain in his lower back. The doctor gave plaintiff a thorough orthopedic examination, a physical examination of "those conditions which affect use of bones and joints and necessarily includes the muscles and scars of skin that might affect the use of bones and joints and those nerves which control the use of bones and joints." Plaintiff manifested "extreme nervous instability. * * * The Romberg test was normal." Plaintiff's neck rotation range was normal. Plaintiff could move all of the joints of his upper extremities and the reflexes were present and normal. After he took off the belt, his back movements were relatively good. He stood erect and "bent over so his finger tips came within 5 or 6 inches of the floor. He carried out the backward bending and to either side about the same range. I could neither see nor feel any bone abnormalities." The measurements of the thighs and legs were equal. He put down his right foot "only partially and could not raise it at a right angle with the leg. The motion in all other joints of the lower extremities was normal and the reflexes were present and equal on both sides. * * * If he had any paralysis, any weakness that was a result of motor paralysis or damage to the nerves that carry the impulses, move the foot, the reflexes ordinarily * * * would not be present. The fact they were present and equal on both sides would indicate there was no loss of motor power, power to move the foot. * * * If there was paralysis of the muscles any place * * * they would shrink and the calf or thigh of the leg affected would be smaller. This test would determine whether he was using these muscles * * * and apparently he was. * * * He walked about * * * on his tiptoes and he walked on his heels. He showed rather poorly on the right * * * but still demonstrated definite lifting power in the muscles which carry out that particular motion."

Upon cross-examination, Dr. Hampton tesified that plaintiff told him about the instant accident. "I examined him for motor control of his muscles, bones and joints, which would show the function of his brain in so doing and it was normal. * * * Insofar as control of his muscles, bones and joints, the examination, as far as the brain was concerned, was normal. * * * There was nothing to indicate any brain damage. * * * The Babinski

test was negative." At the request of plaintiff's counsel, Dr. Hampton explained the Babinski test and gave plaintiff that test in the presence of the jury. The doctor then stated that the courtroom test was negative and that "there is no Babinski sign in that foot."

Dr. Hampton could not find any cause for the pain plaintiff claimed to have in his "low back" and, in his opinion, plaintiff's nervousness "was not the result of injury." Plaintiff had "considerable psychogenic overlay. * * * There are two sets of things that might affect parts of the body. One is called organic, where disease or injury causes it, and the other is psychic. When a man has the nervous instability about which we have been talking, it is termed psychogenic overlay, * * * in this case, nervous instability. * * * There can be psychogenic symptoms with no injury involved at all. * * * This man had his injury. I took him at his word he had these injuries. I still think his difficulty is principally psychic, if not entirely."

X-rays of the back were negative, "showing no bone injury." X-rays of temporomandibular joint showed "no evidence of injury to that portion of his head." In the doctor's opinion, "the nervous condition that I speak of is not the result of an injury." Dr. Hampton found nothing in his examination "in the way of injury that would prevent this man from working, carrying on his activities, normal working activities. * * * He was a rather nervous, unstable type of individual. Except for that, I think, he would be able to carry on his activities. * * * I saw nothing to prevent it." In his opinion, plaintiff was not disabled from doing his work "at the automobile assembly plant. * * * I just don't think he would be as good an automobile worker as he would be if he were not so unstable."

The only evidence that plaintiff was not in good health and had not, prior to the accident, shown symptoms of his back, jaw and foot conditions was his own testimony which, of course, neither the jury nor the trial court (in ruling the new trial motion) had to believe. The basic conflict between defendant's doctor-witness and two of plaintiff's medical witnesses was whether those conditions were the result of trauma received in the accident. The weight of the evidence was that the injuries plaintiff sustained in the accident were minor. The evidence of both parties was that he sustained no fractures and no injuries to the joints or bones, or the muscles or tissues surrounding or nerves in, his jaw, back, right leg or right foot. Under plaintiff's evidence, the head concussion was a slight one—his evidence was that he was so informed at St. Mary's Hospital the night of the accident—he was not rendered unconscious, his headache was relieved by aspirin, and he had no vertigo, nausea or vomiting. X-rays of the skull, including the jaw, were negative at all times.

In the opinion of two Veterans Hospital doctors (plaintiff's witnesses), his back, jaw and foot conditions were psychoneurologic (both psychic and organic) caused by the blow to his head in the accident. However, in the opinion of Dr. Hampton, those conditions were psychoneurotic (nonorganic) and not the result of trauma. Corroborating evidence: The admission of plaintiff's doctors that those conditions could not necessarily have resulted from head trauma; the negative Babinski test at the trial. In other words, the trial court, in ruling plaintiff's new trial motion, obviously found that the weight of the evidence was that plaintiff's jaw and foot injuries were not caused by trauma in the accident. As there was substantial evidence to sustain the trial court's action, we overrule the assignment that the trial court should have sustained plaintiff's new trial motion as to inadequacy of verdict.

Donald Gilbert, a passenger in Speidel's car, testified for plaintiff. Asked upon cross-examination by McNamee's attorney if he was "hurt in this accident," Gilbert said, "I sprained my back a little bit. Q. Did you get all right? A. It seems like it burns every once in a while when I

turn around too quick. Q. You received a payment on behalf of Mr. Speidel in this case, didn't you? A. Yes, sir." *Speidel's* (not *plaintiff's*) attorney objected "to a statement of this kind." Then, out of the jury's presence, *Speidel's* attorney moved for a mistrial and plaintiff's attorney stated: "The plaintiff cannot be charged with any error; the plaintiff cannot be guilty of any error." McNamee's attorney stated that he thought that the testimony was admissible to show the witness' interest and was told by the court, "do not do it any more." The court then said to the jury, "You will be instructed to disregard the last statement about payment of any settlement to anyone. It is no part of the evidence in this case. You will disregard the last statement in reaching a decision in this case."

■ Plaintiff contends that the trial court erred in refusing to declare a mistrial; the testimony "was clearly prejudicial to plaintiff's case * * * and the court's statement to the jury * * * did not cure the defect or the resulting prejudice. Such testimony tended to prove erroneously that defendant McNamee was not at fault in the the accident and thereby prejudiced plaintiff's cause of action against that particular defendant. Common sense dictates that a jury is more likely to return a larger * * * verdict where two defendants are held liable for an accident than in a case where only one defendant is held liable."

We need consider neither whether Gilbert's statement (as to a settlement with McNamee) was admissible nor whether the trial court should have declared a mistrial. This, because (in addition to the fact that plaintiff neither objected to the question nor moved for a mistrial but, on the contrary, clearly indicated that he did not want a mistrial) plaintiff has not demonstrated any situation which obviates application of the usual rule that any error (as to plaintiff) in the admission of this testimony was cured by a substantial verdict for plaintiff. Cochran v. Wilson, 287 Mo. 210, 229 S.W. 1050, 1056[5].

The judgment is affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.

All concur except WESTHUES, J., not sitting.