**Gladys SHEPHERD, Plaintiff-Appellant,**

**v.**

**ST. LOUIS–SAN FRANCISCO RAILROAD COMPANY, Defendant-Respondent.**

**No. 56520.**

Supreme Court of Missouri,
Division No. 2.

June 10, 1974.

---

Jo B. Gardner, Inc., Monett, for plaintiff-appellant.

C. Wallace Walter, Kenneth T. Walter, Mann, Walter, Burkart & Weathers, Springfield, for respondent.

HENLEY, Presiding Judge.

This is an action for damages of $100,000 for personal injuries brought by L. E. Shepherd (plaintiff) against his former employer (defendant) under the Federal Employers' Liability Act.[1] Verdict and judgment were for plaintiff for

$2,500, from which judgment he appealed[2] urging that he be granted a new trial on the issue of damages only. On motion suggesting the death of L. E. Shepherd since the appeal was perfected the court has substituted Gladys Shepherd, widow and personal representative of the deceased, as the party plaintiff; however, for convenience and clarity, we will continue to refer to the deceased as plaintiff.

On September 13, 1969, the date of the accident, plaintiff was employed by defendant as a locomotive engineer and was operating its diesel engine in switching freight cars from one place to another in the Ruth yards in Joplin, Missouri. At about eight o'clock that evening while moving seven or eight loaded ore cars to another track the engine's brakes malfunctioned and failed, causing a collision with stationary cars. The collision threw plaintiff to the engine floor, as a result of which he received injuries to his left arm, shoulder and neck.

■ Plaintiff contends (1) that the court erred in the admission and exclusion of evidence relative to the issue of damages; and (2) that the damages assessed by the jury are inadequate, and so grossly inadequate as to show passion, prejudice and misconduct by the jury. The verdict being in his favor, plaintiff's position on this appeal must necessarily rest upon his contention that the damages assessed were inadequate, because otherwise it could not be said that the charged trial errors materially affected the merits of the case. Rule 84.13(b)[3]; § 512.160, para. 2.[4] Hence, we need not reach or consider these trial errors, even if they may have had a bearing on the amount of the verdict, if the verdict was not inadequate. Kirst v Clarkson Construction Company,

---

1. 45 U.S.C.A. § 51 et seq., and § 23.

2. Notice of appeal was filed before January 1, 1972, the effective date of the 1970 amendment to Mo.Const. Art. V, § 3.

3. References to rules are to Missouri Supreme Court Rules and V.A.M.R.

4. References to sections of statutes are to RSMo 1969 and V.A.M.S.

395 S.W.2d 487, 491 (Mo.App.1965).[5] We proceed then to the principal question: was the amount of damages awarded by the jury inadequate?

In Kirst v. Clarkson, supra, the court of appeals said in an opinion by Stone, J. (395 S.W.2d at 491):

"Under our juridical system, determination of the amount of damages is primarily for the jury. And where, as in the instant case, the trial court has overruled the assignments in the motion for new trial pertaining to alleged inadequacy of the verdict and thus has denied a new trial for inadequacy, the rule upon appeal is that the jury's exercise of its discretion in the assessment of damages is conclusive unless the verdict is so *shockingly inadequate* as to indicate that it is the result of passion and prejudice or of a gross abuse of such discretion. The appellate court does not weigh the evidence but rather seeks only to ascertain whether the trial court abused its discretion in denying a new trial for inadequacy. The appellate inquiry is whether, viewing the record in the light most favorable to the trial court's ruling on the complaint of inadequacy, it may be said fairly and reasonably that the verdict was supported by substantial evidence." See also: Spica v. McDonald, 334 S.W.2d 365, 368 [1–2] (Mo.1960), and cases there cited.

Plaintiff, age 64 at the time of the accident, had worked for defendant since 1942, first as a locomotive fireman and, beginning in 1947, as a locomotive engineer. At the time of the accident he " * * * had steady work off the engineer extra board." His earnings were approximately $1000 per month. Prior to the accident, he had been well, vigorous and accustomed to hard work. He was an avid hunter and fisherman. Prior to the accident he had made plans to retire at age 65 (his 65th birthday was October 28, 1969, 45 days after the accident), by selling his home at Monett and moving to another he owned on Table Rock Lake, and by establishing a sign business and a nursery business. His intention was to retire on his railroad pension and supplement that income with income from the two businesses.

After the accident he finished his work shift and drove home. He knew that he was shaken up but did not file an official report that night because he did not believe he had injuries of any consequence. The next morning (Sunday) he was stiff and sore and had considerable pain in his neck, shoulder and arms. On Monday he went to see Dr. F. L. Edwards in Monett complaining of pain in his left shoulder and arm and numbness in his left hand. He had a large bruise on his elbow. Dr. Edwards made an X-ray of the shoulder and a physical examination of the areas about which plaintiff complained. The examination disclosed that no bone had been fractured, but that there was injury to soft tissue, tenderness in the shoulder muscles, and about 50% limitation of motion in the shoulder joint, with some muscle spasm for which he prescribed a relaxant medicine. Dr. Edwards next saw him on September 24, 1969. Plaintiff was still complaining of pain in the same areas and, in addition, pain in his neck. Examination of the neck showed about 25% limitation of motion due to muscle spasm. Rotation and bending of the neck appeared to be painful. The doctor prescribed continuation of the muscle relaxants. Dr. Edwards saw plaintiff several more times, the last time being on November 28, 1969. On this visit the limitation of motion in the shoulder joint had been reduced to 25%. Because plaintiff felt his shoulder was worse, the doctor referred him to an orthopedic surgeon in Springfield and made an appointment for him.

Instead of keeping that appointment, plaintiff went to see Dr. John Tsang, a neurosurgeon of Springfield. Dr. Tsang's

5. See and compare: Stone v. Farmington Aviation Corp., 360 Mo. 1015, 1021, 232 S.W. 2d 495, 499 [4] (1950); Cochran v. Wilson, 287 Mo. 210, 229 S.W. 1050, 1056 [5] (1921); McCormack v. McNamee, 274 S.W.2d 272, 279 [10] (Mo.1955).

findings were essentially the same as those of Dr. Edwards and, in addition, he found evidence indicating possible involvement of nerve roots in the cervical area suggesting that a myelogram should be performed to rule out a slipped or herniated disc. Plaintiff was hospitalized a little over two days for this purpose. The myelogram confirmed that there was no disc injury. However, it did reveal a moderate amount of preexisting osteoarthritis in the cervical area, the result of the process of aging. In summary, Dr. Tsang's diagnosis was that plaintiff had received a cervical strain; that, specifically, the sixth cervical nerve root was involved, and that the preexisting osteoarthritis had been aggravated. Based on this diagnosis, Dr. Tsang recommended that his treatment include traction, heat applications and a muscle relaxant under the supervision of plaintiff's local physician. Plaintiff returned to see Dr. Tsang a month later, as planned. This time Dr. Tsang recommended the same physical therapy, but that it be administered under supervision in a hospital. Plaintiff was hospitalized 13 days for this purpose. Dr. Tsang saw plaintiff several times after the hospitalization, the last time being on July 21, 1970. Plaintiff was still complaining of pain, numbness and weakness in the same areas. The doctor's opinion was that there was improvement in plaintiff's condition, that he should continue to increase his activities to further improve his physical condition, but that "[p]robably he will always have some pain * * *" from arthritis.

During most of the period of time between the performance of the myelogram and trial date (December, 1970), plaintiff was treated also by Dr. William Galvin, an osteopath of Noel, Missouri. He saw Dr. Galvin approximately twice each week. His findings and conclusions were essentially the same as those of Doctors Edwards and Tsang. In addition to therapy, consisting of applications of heat to the affected areas, cervical traction and a muscle relaxant, Dr. Galvin also treated plaintiff by manipulation of his neck. He also prescribed the taking of ACTH for the arthritis. Immediately after plaintiff started taking this medication his condition began to improve. It was the doctor's opinion at trial that plaintiff was considerably improved, but that he would continue to have some pain and discomfort.

Plaintiff's doctor and hospital bills were a little over $1600.

Although plaintiff knew that he could apply for a disability pension, and said that he did in fact apply for such pension after his injury, the evidence is that on October 27, 1969, the day before his 65th birthday, "he made application for an annuity under [the] Railroad Retirement Act * * *" in which he stated that he "* * * had voluntarily given up any employee rights to return to service." The application was on a printed form which stated: "This form is *not* to be used by any railroad employee who is applying for *disability* benefits under the railroad retirement act." (Emphasis supplied.) On October 31, three days after his 65th birthday, he signed a letter addressed to an official of defendant at Springfield advising that he had taken his railroad retirement annuity and his services with the railroad should be terminated effective October 1, 1969.

For several months prior to the trial in December, 1970, plaintiff used and drove a half-ton pickup truck (not equipped with power steering or power brakes) in his nursery and sign business. During this time, while assisting in remodeling his home on Table Rock Lake, he handled a few building rocks, "but nothing heavy."

The main thrust of the defense of this case was that plaintiff suffered no serious or permanent injury; that his principal injury was aggravation of the preexisting arthritic condition. The jury reasonably could have found this to be the extent of injury. We cannot say that, on this record, the verdict was grossly or shockingly inadequate or that the court abused its

discretion in denying a new trial on the issue of damages.

Although we well might pass over without further comment plaintiff's charges of error in the admission and exclusion of evidence, since we are unable to say we are dealing with an inadequate verdict, we have, as requested by plaintiff, considered those charges in connection with the claim of inadequacy as tending to show that the verdict was the result of " * * * passion, prejudice and misconduct on the part of the jury * * *." We find no merit in the claim.

■ As stated in plaintiff's brief, "[t]he real and only issue to be tried in the case is whether plaintiff has any disability [and, if so], how long it extended and whether or not it was permanent." The admission in evidence over objection of (1) plaintiff's application for an annuity under the railroad retirement act on a form which stated it was not to be used by an employee applying for disability benefits; and, (2) plaintiff's letter to an official of defendant that his services should be terminated as of a prior date was not error. The application and the letter were offered by defendant and received on the theory that they were evidence of an admission by plaintiff that he was not claiming disability benefits because he had not suffered a disability. In connection with the offer, defendant asserted, and it argues here, that if plaintiff had a disability and intended to apply for a disability pension, as plaintiff contends, he would not have used a form which stated clearly that it was not to be used by an employee who intended to apply for disability benefits. While this evidence is certainly not conclusive on this issue, it was admissible for consideration by the jury in determining whether plaintiff had in fact suffered a disability as a result of the collision and, if so, its extent. St. Louis-San Francisco Ry.

Co. v. NesSmith, 435 P.2d 602, 605–607 (Okl.1967); Kulengowski v. Withington, 222 S.W.2d 579, 584–585 (Mo.App.1949); Bennett v. Southern Railway Co., 117 Ga. App. 414, 160 S.E.2d 677, 678 (1968). Cases cited by plaintiff [6] in support of his contention that this evidence was not admissible are distinguishable in that those cases turned on the admissibility of evidence that the plaintiff was *receiving* a retirement pension or disability pension, the court holding that such evidence was inadmissible. In this case there was no evidence that plaintiff was then or would ever receive such pension. We note in passing that *plaintiff* offered to prove that he had received a pension for the month of October, 1969, but that the offer was denied.

■ The court's refusal to admit in evidence correspondence (plaintiff's exhibits 6, 7, 8, 8(a) and 8(b)) between plaintiff and defendant relative to discipline of plaintiff by defendant for his failure to report promptly the alleged injury was not error. Plaintiff argues that this evidence would tend to explain the type of pension he had applied for and his reasons therefor. We have examined the record and cannot find wherein this evidence would have any relationship to such explanation. It is wholly foreign to the matter of a pension and the court correctly excluded the evidence on the ground that it would inject a collateral issue in the case. Moreover, plaintiff was afforded the opportunity to and did testify relative to the type of pension he applied for, his reasons therefor, and the circumstances in which he made such application.

■ Nor did the court err in refusing to admit in evidence as bearing upon the amount of damages, two interrogatories and answers thereto relative to plaintiff's earnings for the year prior to the accident and earnings for the year thereafter of the engineer who took his place. In the first

6. Eichel v. New York Central Railroad Co., 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963); Raycraft v. Duluth, etc., Railway Co., 472 F.2d 27 (8th Cir. 1973); Tipton v. Socony Mobil Oil Co., 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4; Sinovich v. Erie Railroad Co., 230 F.2d 658 (3d Cir. 1956).

place, no question was raised during the trial of the case as to the amount of plaintiff's earnings or what he would have earned had he continued to work for defendant. Plaintiff testified that his earnings for the previous year had been in excess of $1000 per month and the case was tried on the theory that it was conceded that this was accurate and that if he had continued to work his earnings would have been at least the same. The answers to interrogatories would have shown no more than this and were cumulative merely.

For the reasons stated, the judgment is affirmed.

All of the Judges concur.