STATE of Missouri, Plaintiff-Respondent,

v.

John Dale HENSON,
Defendant-Appellant.

No. 10368.

Missouri Court of Appeals,
Springfield District.

June 13, 1977.

Jasper N. Edmundson, G. H. Terando,
Hyde, Purcell, Wilhoit & Edmundson, Poplar Bluff, for defendant-appellant.

John Ashcroft, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before BILLINGS, C. J., and HOGAN and FLANIGAN, JJ.

FLANIGAN, Judge.

John Dale Henson, charged as a second offender, was found guilty by a jury of the second degree murder of his 14-year-old nephew Jackie Fletcher. Judgment was entered on the verdict and defendant received a sentence of 35 years. Defendant appeals.

Defendant's first point is that the trial court erred in refusing to instruct the jury on the issue of self-defense. The trial court did instruct the jury on excusable homicide, (MAI–CR. 2.28 "The Killing of Another by Accident or Misfortune").

█ If there was substantial evidence of self-defense, the trial court was required to instruct thereon, whether requested or not. *State v. Boyd*, 498 S.W.2d 532, 533[1] (Mo.1973). In determining whether the evidence was sufficient to support the giving of a self-defense instruction, this court must consider the evidence in the light most favorable to the defendant. *State v. Cole*, 377 S.W.2d 306, 307[1] (Mo.1964).

█ The defenses of self-defense and accident are inconsistent. *State v. Peal*, 463 S.W.2d 840, 842 (Mo.1971). If the shot was fired in self-defense, the firing resulted from the voluntary act of defendant; if the shot was accidental, the act was involuntary. *State v. Harkins*, 535 S.W.2d 462, 464 (Mo.App.1976). Both defenses, self-defense and accident, must be submitted where each is supported by the evidence, unless defendant's personal testimony is relied upon to support both. *State v. Sanders*, 541 S.W.2d 530, 533[2] (Mo. banc 1976).

The parties stipulated that Jackie's death, which occurred on April 13, 1975, was caused by a gunshot wound to the forehead. The shooting took place at the trailer home of Gladys Henson, mother of defendant and grandmother of Jackie. Jackie had been living with his grandmother for about two weeks. Present at the time the shooting took place, in addition to defendant and the victim, were Kenneth Huggins, the state's principal witness, and Gladys Henson, the principal defense witness. Defendant did not testify.

According to Huggins, he and defendant had spent most of April 13, 1975, drinking beer. Later that evening, some time after Jackie and Gladys had gone to bed, Huggins and defendant went to Gladys's trailer. The living room of the trailer adjoins the kitchen. Jackie and Gladys arose after the two men entered. A bowl of greens was sitting on a table. Defendant picked up a handful of greens, threw them on the table, and told Gladys he wished she would fix him something to eat. Defendant teased Gladys, and he "was speaking maybe a little loud, probably cussing some."

Huggins said that Jackie kept trying to get defendant to get up from where he was sitting. Jackie "was wanting to whip him for some reason, and he kept on, and (defendant) did get up once, and he set back down. (Jackie) said, 'You're not going to talk to my grandmother that way.'"

"Q. What happened then?

"A. Well, the boy just kept on and on, and after a bit John just jumped up and ran outside the door and came back in with the gun." . . .

"Q. Now, what happened when John Dale Henson came back into the house?

"A. He came in, and after I heard him come in I turned and looked, like this, and I saw the gun and it fired at that time and the boy fell." . . .

"Q. How fast did this shot transpire after John come back in the house?

"A. Well pretty fast. By the time I turned and saw the gun and everything, it fired, and just that fast, real fast.

"Q. Was it just a split second time thing?

"A. Like I turned like this and looked, and the gun went off."

According to Huggins, at the time the gun was fired, defendant's arm "was extended out from his chest." Huggins had seen the gun earlier that day when it was in the defendant's car. At that time it was in a holster and the hammer on it was not cocked. After looking at the gun, Huggins placed it back in the holster and put it under the car seat, still uncocked. Huggins testified that he did not see Jackie "with any sort of weapon that evening." Jackie and the defendant were approximately the same size. When the shooting took place the defendant was about 12 feet from Jackie. Jackie was then standing in the center of the kitchen and the defendant was about one step inside the front door of the trailer.

Gladys testified that about 10 p. m., prior to the arrival of the defendant and Huggins, Jackie had fixed himself two cheeseburgers with the use of a butcher knife. After defendant and Huggins arrived, defendant began to kid her about the turnip greens. Gladys told defendant he was silly for drinking and defendant told her that she was an old fuddy duddy. This made Jackie mad "so he run at (defendant) and hit him and knocked (defendant) backwards. (Defendant) shoved (Jackie), and I grabbed (Jackie) by the shoulder and pulled him back. (Jackie) just kept getting madder and madder."

Gladys also testified that when she grabbed Jackie and pulled him back, Jackie picked up the butcher knife and "drawed it back." When that happened, defendant left the trailer, making the statement, "I have something in the car for you." The defendant came back in with a gun. While defendant was outside the trailer getting the gun, according to Gladys, "Jackie just stood there . . . I told him to put the knife down but it didn't do no good."

Gladys testified that when the defendant returned to the trailer with the gun, he stood on the partition line between the living room and the kitchen, about three feet from Jackie. Jackie had the knife in his hand at that time, "he just still kept it drawed back, holding it drawed back." When asked whether Jackie was waving the knife back and forth, Gladys said, "I don't know, I can't swear to that. I just know he had it drawed back." Gladys said that the defendant was then holding the gun in his hand and was "looking down toward the floor." Defendant yanked the holster off the gun and it went off. Defendant was not holding the gun out in front of him but had it down "along about his stomach" with his head and shoulders bent. Gladys stated that she did not see defendant "ever point the gun at Jackie." She also said that the shot was fired just a second or two after defendant stepped back in the trailer.

■ The right of self-defense is not to be invoked unless all other means fail. *State v. Roberts,* 294 Mo. 284, 242 S.W. 669, 674 (1922). "If he could have safely avoided using the weapon he was not justified in taking the life of the deceased." *State v. Johnson,* 76 Mo. 121, 126 (1882). "The law of self-defense may imply the right of attack when it appears reasonably necessary to protect one's self from an impending assault. . . . Yet it remains the law of necessity, real or apparent. And the danger must be imminent or reasonably appear to be so." *State v. McGee,* 361 Mo. 309, 234 S.W.2d 587, 591[6] (Banc 1950). "Self-defense is a last resort and in order to justify a homicide on such grounds the doer of the homicidal act must have done everything in his power, consistent with his own safety, to avoid the danger and avert the necessity, and he must retreat, if retreat be practicable." *State v. Sherrill,* 496 S.W.2d 321, 325[14] (Mo.App.1973); *State v. Jackson,* 522 S.W.2d 317, 319[3] (Mo.App.1975).

■ Although the jury could have found that Jackie was the aggressor in the initial confrontation between him and defendant, that confrontation ended upon defendant's departure from the trailer. Jackie did not pursue him. The testimony of Gladys, who alone said that Jackie had a knife, was that "Jackie just stood there." Defendant went outside, entered the automobile, and obtained the gun. His re-entry into the trailer was not a product of "necessity, real or apparent." Far from doing "everything in

his power, consistent with his own safety, to avoid the danger and avert the necessity," *State v. Sherrill*, supra, defendant re-entered the trailer and immediately shot his victim.

The law will not condone defendant's voluntary resumption of the confrontation nor its tragic consequences. The right of self-defense, precious and fundamental as it is, will not be contorted into a hunting license.

In *State v. Adkins*, 537 S.W.2d 246 (Mo. App.1976), defendant and his victim were fighting each other in an automobile. Thereafter the defendant emerged from the automobile, but re-entered it and resumed the struggle which culminated in the death of his adversary. In rejecting defendant's contention that the trial court erred in refusing to instruct on self-defense, the court said, at p. 249:

"The force used in self-defense must not exceed the bounds of what is necessary or reasonably appears necessary for defense or prevention. . . . Further, where the accused continued or *renewed* the struggle when he had an opportunity to abandon or decline further, he became the aggressor, irrespective of whether he was at fault with the original difficulty, and is not justified in claiming self-defense. 40 C.J.S. Homicide § 133."

The evidence in this record would not support a finding that defendant "had reasonable cause to believe and did believe that it was necessary for him to act as he did to protect himself from such danger." The quoted finding "must be included in every self-defense instruction in homicide cases." Para. 3 of Notes on Use to MAI–CR. 2.40.

The trial court properly refused to instruct the jury on the issue of self-defense. *State v. Adkins*; *State v. Roberts*; *State v. McGee*; *State v. Sherrill*, all supra.

Defendant's second point is that the trial court erred "in refusing to grant defendant's motion to quash the jury panel in that said panel was not selected in accordance with § 494.250 RSMo 1969, which requires the regular and alternate list of perspective (sic) jurors to be exhausted before ordering the sheriff to summon prospective jurors from bystanders."

The trial judge was Hon. Flake L. McHaney, who replaced the regular judge, Hon. Rex A. Henson, the latter having been disqualified on defendant's motion. After the jury panel was sworn, defendant's counsel orally moved that the entire[1] panel be "discharged" on several grounds, including the only one mentioned in his second point, and elaborated upon in the argument portion of the brief, to the effect that the sheriff summoned bystanders "before the list of alternate petit jurors had been exhausted." Even if, which need not be decided, the cited statute was applicable to this situation, the fact is that the list of alternate petit jurors had been exhausted before the sheriff summoned the bystanders.

In connection with defendant's motion, the court heard the testimony of the circuit clerk. He testified that Judge Henson had, prior to the trial of this case, excused all but 23 of the members of the original list of jurors summoned pursuant to § 494.250, para. 1.[2] Of the 23, 19 were present at the commencement of this trial as panel members. The other four were two women, a 74-year-old man, and a man who "has a one-man insurance office." It is the essence of defendant's complaint that the bystanders were summoned before these four people were excused.

Although the four people were not present in the courtroom, Judge McHaney entered an order excusing the two women "based on the statute which permits them to request to be excused" (§ 494.031[2]), excusing the 74-year-old man "because of his age" (§ 494.031[1]), and excusing the insurance man "since he is a one-man operation" (§ 494.031[9]). It will be observed

---

1. "In order, however, to constitute a ground for a challenge to, or motion to quash, the array, his objection must go to the whole array or panel, and not merely to individual persons on it." 47 Am.Jur.2d Jury § 229, p. 817.

2. Defendant at no time claimed that there was any noncompliance with § 494.250, para. 1. He claims noncompliance with § 494.250, para. 2.

that, by reason of Judge McHaney's proper excusing of the four people, "the list of alternate petit jurors"[3] had in fact "been exhausted." The fact that the excusing took place after the bystanders had been summoned is of no moment. It was at most a "mistake or informality" which constitutes no ground for error. *State v. Breen,* 59 Mo. 413, 415 (1875).

Moreover, statutes pertaining to summoning jurors, including § 494.250, "have uniformly been construed as merely directory and not mandatory." *State v. Thompson,* 472 S.W.2d 351, 353[2, 3] (Mo. 1971). The burden of proof rested upon defendant to show a noncompliance with the statute. *McCormack v. McNamee,* 274 S.W.2d 272, 275 (Mo.1955). Even if there was a lack of strict compliance with the statute, no error would result absent a showing of prejudice. *State v. Adams,* 497 S.W.2d 147, 153[3] (Mo.1973); *State v. Hailey,* 350 Mo. 300, 165 S.W.2d 422, 423[1, 2] (1942); *State v. Wheeler,* 318 Mo. 1173, 2 S.W.2d 777, 778[2] (1928); *State v. Pettis,* 522 S.W.2d 12, 15[5, 6] (Mo.App.1975). The latter has not been demonstrated.

Defendant's third point is that the trial court erred "in refusing to grant defendant's motion to quash the jury panel in that 14 members of said panel were selected by deputy sheriffs who were witnesses for the state and against the defendant."

A sufficient answer to this point is that it has no factual support. The record does show that the two deputies testified for the state. Defendant's brief says that they "were also involved in the summoning of the 14 bystanders who made up part of the jury panel." The transcript contains no basis for that remark.

The judgment is affirmed.

All concur.

---

**3.** There was no showing whether any of the four persons excused was a regular or an alternate juror.